UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 19 CV 02142

------------------------------------------------------------- x

LEK SECURITIES CORPORATION and
ROX SYSTEMS, INC.

                       *Plaintiffs*,

          - against –

NICOLAS LOUIS, JONATHAN FOWLER, VOLANT
HOLDING, LLC d/b/a VOLANT TRADING, VOLANT
TRADING, LLC, VOLANT LIQUIDITY, LLC, AND
VOLANT EXECUTION, LLC

                       *Defendants*.

------------------------------------------------------------- x

Case No.: _____

## COMPLAINT

JUDGE SWAIN

Plaintiffs Lek Securities Corporation ("LSC" or "Plaintiff") and ROX Systems Inc. ("ROX Systems," together with LSC, "Plaintiffs" or "LSC/ROX"), by their attorneys Dentons US LLP and Tannenbaum Helpern Syracuse & Hirschtritt LLP, as and for their Complaint against the individual defendants Nicolas Louis ("Louis"), Jonathan Fowler ("Fowler," together with Louis, the "Former Employees"), and against the entity defendants Volant Holding, LLC d/b/a Volant Trading ("Volant Holding"), Volant Trading, LLC ("Volant Trading"), Volant Liquidity, LLC ("Volant Liquidity"), and Volant Execution, LLC ("Volant Execution") (referred to together as "Volant"), hereby allege as follows:

### The Former Employees' Pattern Of Misconduct And The Need For Immediate Injunctive Relief

1.     This is an action for both injunctive relief and monetary damages arising from Defendants' scheme to misappropriate Plaintiffs' trade secrets and copyrighted materials that Plaintiffs developed over decades at a cost of over $50 million. The Former Employees have engaged in a clandestine plan to misappropriate Plaintiffs' proprietary stock and options clearing technology -- a scheme they have codenamed "Operation Secret Octopus." Volant has

threatened to employ the Former Employees in positions which would both result in a blatant violation of the Former Employees' post-employment non-competition agreements and the inevitable violation of the Former Employees' ongoing confidentiality obligations owed to the Plaintiffs.

2.      Notably, this is not the first time that Louis and Fowler have sought to engage in such misappropriation.  The Former Employees had planned to begin work at B. Riley Capital Management, LLC ("B. Riley"), a competing financial firm, following their separation from LSC in 2018.  In emails, Louis and Fowler called themselves "The Dream Team" and described month-by-month Operation Secret Octopus: a covert scheme orchestrated by Louis and Fowler as a team to recreate and deploy LSC/ROX's proprietary clearing technology in exchange for financial gain.  Louis's and Fowler's plan to transition to B. Riley in 2018, where they would recreate Plaintiffs' proprietary clearing technology, involved transferring LSC's operational data and ROX's proprietary source code from Plaintiffs' secure network systems to (1) devices the Former Employees controlled, (2) Microsoft Azure cloud computing accounts and (3) upon information and belief, to a Dropbox account for which only the Former Employees had password protected access.  That Louis and Fowler were fully aware of the value of their knowledge of LSC's proprietary clearing technology and their unique roles at LSC is indisputable.  Louis himself stated in a confidential memorandum prepared as part of Operation Secret Octopus (the "Confidential Memorandum") that his and Fowler's plan to recreate LSC's clearing technology at a rival firm was "likely going to put Lek out of business. We [Louis and Fowler] ARE the clearing part of Lek."

3.      In mid-2018, after the Former Employees submitted their resignations to LSC in order to join B. Riley, LSC informed B. Riley that (1) the Former Employees were bound by

non-competition and confidentiality agreements, (2) Fowler had admitted an intent to recreate LSC's clearing technology at B. Riley, and (3) LSC was prepared to bring an action to protect its contractual and intellectual property rights. Upon receiving this information from LSC, B. Riley promptly rescinded its joint employment offer to the Former Employees and promised not to misappropriate LSC/ROX's trade secrets. Moreover, B. Riley voluntarily produced emails disclosing the existence of Operation Secret Octopus, including Louis's and Fowler's business plan to recreate inside the span of one (1) year that which it had taken LSC over 25 years to develop.

4.      Undaunted, Louis and Fowler now apparently seek to pursue their tortious conduct at Volant, yet another financial firm. On or around January 14, 2019, Samuel Lek ("Mr. Lek"), LSC's and ROX's CEO, received a phone call from Howard Schiffman, Esq. ("Schiffman"), a partner with the law firm of Schulte Roth & Zabel LLP ("Schulte"), LSC's former counsel. Surprisingly, Schiffman was not calling to discuss potential LSC representation. Rather, Schiffman -- despite having worked with Louis on behalf of LSC in a matter that involved many of the same LSC confidential and proprietary processes at issue here -- indicated he was now representing Volant, and informed Mr. Lek that Volant intended to hire Louis and Fowler to create a stock and options clearing operation for Volant. Moreover, Schiffman noted that Volant planned to hire the Former Employees even though Volant was aware of the Former Employees' written non-compete and confidentiality agreements that expressly prohibit each of them from transmitting, using, or creating a derivative of Plaintiffs' confidential information and competing with Plaintiffs for 18 months after leaving Plaintiffs' employ.

5.      In response, Mr. Lek told Schiffman that if Volant wanted to acquire the LSC/ROX technology, it could do so by legally licensing the technology. Volant considered Mr.

Lek's suggestion but no licensing agreement was reached. Plaintiffs' counsel then wrote to Schiffman to protest both Volant's planned tortious conduct and Schiffman's and Schulte's conflict of interest. Based on information and belief, Volant has extended offers of employment to the Former Employees to have them work in positions and perform responsibilities similar to the positions and responsibilities they had at LSC. Upon information and belief, the Former Employees' employment at Volant is imminent (if it has not started already).[1] Accordingly, immediate injunctive relief is needed to enforce the Former Employees' post-employment restrictive covenants and to protect the Plaintiffs' confidential and proprietary trade secret information described further below.

6.      LSC is a broker-dealer. The confidential and proprietary technology at issue in this action is held by LSC's affiliate, ROX Systems, which was formed to hold the proprietary technology and intellectual property that LSC uses. LSC holds a license from ROX Systems for the use of this technology and intellectual property. In the course of its business, when broker-dealers like LSC and Volant buy or sell securities for their customers, or for their own account, they must, after agreeing with a counterparty on the terms of the sale, arrange for the exchange of funds and securities. Few broker-dealers handle this function themselves; rather, they pay financial transaction clearing firms to perform this function. To perform these transactions in a way that complies with the expectations of regulators and counterparties, almost all broker-dealers in the United States subscribe to and pay substantial fees to large clearing firms, such as Pershing, ABN AMRO, and Goldman Sachs. In turn, these clearing firms use technology provided by large service bureaus such as Broadridge (formally ADP) and FIS (formally SunGard). These service bureaus typically use legacy IBM mainframe technology that is inflexible and expensive.

---

[1] Plaintiffs just learned that Fowler registered with Volant Execution as of March 6, 2019.

7. LSC and ROX Systems have created a unique market advantage over the past few decades by developing a reliable, inexpensive, confidential and proprietary method for clearing trades without having to use third party clearing firms. Unlike the processes used by large clearing firms, LSC and ROX Systems can perform the clearing functions without using expensive and cumbersome mainframe computer technology and hardware. Further, LSC and ROX Systems' processes are more efficient because they run in real-time as opposed to end-of-day batch processes.

8. Similarly, LSC and ROX Systems have created a unique market advantage over the past few decades by developing a reliable, confidential and proprietary options clearing system that does not require the use of mainframe technology. In order to manage LSC's options clearing business, LSC and ROX developed proprietary applications that interface with the Options Clearing Corporation ("OCC"). One of these applications is a graphical user interface ("GUI"), the "Dashboard," developed by Fowler, by which LSC employees can effectively communicate with the OCC. The Dashboard's unique features and automated processes have increased efficiency while decreasing LSC's costs.

9. LSC and ROX Systems created their proprietary stock and options clearing systems from scratch. None of their personnel that created these systems had previously worked in operations at any other firm that provided for clearing services prior to joining LSC or ROX Systems. As a result, LSC and ROX Systems' staff created entirely novel processes to manage its clearing system. LSC's and ROX Systems' approach to these functions would be expensive and time consuming for another firm to develop since the approaches LSC and ROX Systems use are not known by other broker-dealers or software developers. The exact approach LSC takes has evolved over time and has been improved through LSC's years of experience. LSC's

5

processes and the design of its systems constitute highly confidential trade secrets that LSC makes substantial efforts to protect.   These highly confidential processes save LSC and its customers millions of dollars per year.

10.   Yet these confidential proprietary systems can readily be replicated by Louis and Fowler, who know exactly the way to develop the system from scratch based on their experience doing so while employed by LSC/ROX. As Louis noted in the Confidential Memorandum, "The initial implementation of the processes will primarily be done by Nicolas Louis and Jon Fowler. *Application will be primarily built "from scratch", done "the right way"*. No outside provider (Broadridge,.. .). Application will be written in C#, using latest Dot.Net environment. *This team has an in depth knowledge of the "how-to" as it [Louis and Fowler] has already built the applications used in a production environment today."* (Emphasis added).  If Louis and Fowler are permitted to work at Volant to replicate LSC's and ROX Systems' stock and options clearing technology or are permitted to disclose this proprietary code and technology to Volant, LSC and ROX Systems will be irreparably harmed.  Furthermore, if this is permitted to occur, the trade secrets that form the bedrock of LSC's business will be acquired in clear violation of the Former Employees' continuing confidentiality and non-compete obligations, LSC's unique place in the market will be lost, and Volant will have been able to effectively steal what it could not itself develop.

11.   Immediate, preliminary, and permanent injunctive relief are necessary to protect the highly confidential trade secrets and copyrighted materials and to enforce Louis's and Fowler's ongoing confidentiality and non-compete obligations.

## PARTIES

12.     Plaintiff LSC is a corporation duly organized under the laws of Delaware with its principal place of business located at One Liberty Plaza, 52nd Floor, New York, NY 10006.

13.     ROX Systems, Inc. is an Illinois corporation with its principal place of business located at One Liberty Plaza, 52nd Floor, New York, NY 10006.

14.     Upon information and belief, Louis is an individual currently residing at 185 East 85th Street, Apt. 20D, New York, NY 10028.

15.     Upon information and belief, Fowler is an individual currently residing at 1140 Sydney Park, Richmond Heights, MO 63117. Fowler agreed to the exclusive jurisdiction of the courts of New York in his Non-Compete and Confidentiality Agreement dated October 10, 2011.

16.     Upon information and belief, Volant Holding is a limited liability company organized under the laws of Delaware and currently maintains an office located at 7 World Trade Center, New York, NY 10007.  Upon information and belief, Volant Holding also does business under the name Volant Trading and/or through the website www.volanttrading.com.

17.     Upon information and belief, Volant Trading is a limited liability company organized under the laws of Delaware and currently maintains an office located at 250 Vesey Street, Suite 2601, New York, NY 10281.

18.     Upon information and belief, Volant Liquidity is a limited liability company organized under the laws of Delaware and currently maintains an office located at 250 Vesey Street, Suite 2601, New York, NY 10281.

19.     Upon information and belief, Volant Execution is a limited liability company organized under the laws of Illinois and currently maintains an office located at 233 S. Wacker Dr., Suite 4040, Chicago, IL 60606.

## JURISDICTION AND VENUE

20.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331

because this action is being brought under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et*

*seq.*, and pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action is being brought for

violations of the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*

21.     This Court has supplemental jurisdiction over Plaintiffs' remaining claims

pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative

facts and otherwise form part of the same case or controversy.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400 because the

Defendants' wrongful acts and omissions that are the subject of this litigation occurred, in whole

or in substantial part, in this District, Volant at all times relevant hereto had a place of business in

this District, Louis is a resident of this District, and Fowler was employed by LSC and plans to

work or has begun working at Volant, which have principal places of business in this District.

23.     Fowler also agreed to the exclusive jurisdiction of the courts of this District in his

Non-Compete and Confidentiality Agreement.

24.     This action also arises out of conduct that provides a basis for personal

jurisdiction against each Defendant under New York Civil Practice Law and Rules §§ 301 and/or

302 in that the claims herein arise from tortious conduct in New York, contracts entered into in

New York, and/or tortious conduct outside of New York that has caused injury to LSC and ROX

Systems in New York.

25.     This Court has personal jurisdiction over Volant Holding, Volant Trading, and

Volant Liquidity pursuant to CPLR §§ 301 and/or 302 because each of them either (1) maintain

an office in New York and, therefore, had, and continue to have, continuous and systematic

8

contacts with New York, (2) transacted business in New York with respect to the transactions at issue in this case, or (3) committed tortious acts within the State of New York and/or committed tortious acts outside the State of New York causing injury to property within the State of New York from which the claims at issue in this action arise. The Court has personal jurisdiction over Volant Execution pursuant to CPLR § 302 because, upon information and belief, it either (1) transacted business in New York with respect to the transactions at issue in this case, or (2) committed tortious acts within the State of New York and/or committed tortious acts outside the State of New York causing injury to property within the State of New York from which the claims at issue arise.

26.     This Court has personal jurisdiction over Louis pursuant to CPLR §§ 301 and/or 302 because Louis is a New York resident and domiciliary and, therefore, had, and continues to have, continuous and systematic contacts with New York, transacted business in New York with respect to the transactions at issue in this case, and has committed tortious acts within the State of New York from which the claims at issue arise.

27.     This Court has personal jurisdiction over Fowler pursuant to CPLR §§ 301 and/or 302 because Fowler agreed to the exclusive jurisdiction of the New York courts in his Non-Compete and Confidentiality Agreement, and has either (1) transacted business in New York with respect to the transactions at issue in this case, or (2) committed tortious acts within the State of New York or from Missouri causing injury to property within the State of New York from the which the claims at issue arise.

## FACTS

**LSC's Broker-Dealer Services**

28.     Broker-dealers are firms that buy and sell securities on behalf of their customers or for their own accounts.  Plaintiff LSC is a registered broker-dealer that performs a number of financial services for both its individual and institutional investors in the course of completing sophisticated financial transactions.

29.     LSC accepts orders from its customers to buy and sell securities and other financial instruments and then attempts to obtain execution on those orders at favorable prices. LSC receives almost all of its orders electronically and receives almost a million orders per day.

30.     After LSC executes orders, it also provides clearing and custodial services for its customers with respect to those transactions using LSC's and ROX Systems' applications, programs, algorithms, and systems created in-house from scratch.  These services are described in more detail below.

31.     In order to efficiently and accurately perform its execution, clearing, and custodial services for customers, LSC spent millions of dollars creating and refining LSC's and ROX Systems' applications, programs, algorithms, and systems that are confidential and proprietary and give LSC a competitive advantage over its competitors in the broker-dealer industry.

32.     The loss of LSC's and ROX Systems' stock and options clearing system trade secrets and copyrighted materials to another financial firm would be devastating to LSC because it would eliminate LSC's advantage over its competitors who do not have those unique and efficient systems in place and the competitors would be able to quickly implement those systems at a small fraction of the cost that LSC and ROX Systems have spent.

33.     As a result, financial firms with access to Plaintiffs' clearing system trade secrets and copyrighted materials would be able to expand or create a new clearing business and charge their customers much lower prices than LSC thereby causing LSC to lose customers and millions of dollars in fees.  Further, Plaintiffs' loss of these trade secrets would result in the devaluation of both LSC and ROX Systems.

**Plaintiffs' Stock and Options Clearing System**

34.     Plaintiffs' clearing system consist of more than 200 computer applications that work seamlessly together to send orders to market centers; receive execution reports; match customer orders with reports of executions and with reports from the clearing houses; book trades to customers' accounts; compute commissions, exchange fees and other expenses; reconcile its books and records with outside sources; maintain an accurate general ledger and stock record; and perform custodial functions, such as safekeeping, income collection, corporate actions processing, and tax reporting.

35.     On information and belief, the commercially available clearing house systems, which are generally third party institutions such as Broadridge, Pershing, Goldman Sachs, and ABN AMRO, all use mainframe computer technology to perform these services.

36.     All known large brokers that perform "clearing," meaning that the broker can perform the clearing services itself, also use mainframe computer technology.

37.     Mainframe computer systems, which are larger and have more processing power than the personal computers or servers used by LSC, cost millions of dollars to install, and are generally cost-prohibitive for most broker-dealers outside of the nation's largest financial institutions.  For many years, this effectively prohibited smaller broker-dealers from offering clearing services.

38.     Clearing services are highly desirable to traders who deal in large volumes because it is more efficient and less expensive than using third-party clearing firms.

39.     Broker-dealers that offer clearing services have a significant competitive advantage over broker-dealers who do not offer clearing services.

**LSC Develops an Alternative to Mainframe Clearing**

40.     LSC was founded in 1990 by Mr. Lek, who is its current Chief Executive Officer. Prior to founding LSC, Mr. Lek was a managing director at Bear Stearns & Co.

41.     Mr. Lek recognized that LSC could gain a significant competitive advantage over competitor smaller broker-dealers by offering clearing services to its customers. As a result, LSC spent years and millions of dollars creating and refining a highly confidential and highly unique proprietary clearing system from scratch.

42.     Unlike the clearing programs used by large financial institutions, LSC's clearing system does not require the use of mainframe computer technology. Upon information and belief, LSC operates the only broker-dealer clearing system that does not require the use of mainframe computer technology in the United States.

43.     In order to make a non-mainframe clearing system, LSC created and improved numerous computer applications that work in tandem with one another. The system's architecture, and the pattern in which these applications are compiled, are highly confidential trade secrets and have been copyrighted.

44.     By avoiding reliance on mainframe computer technology, LSC is able to provide clearing services to its customers at a fraction of the price charged by other broker-dealers, thereby giving LSC an advantage over its competitors.

45.     This unique clearing technology is extremely valuable and highly sought after by competitor broker-dealers.

46.     LSC's confidential and proprietary clearing technology system encompasses individual LSC applications, programs, algorithms, and systems that are, themselves, proprietary trade secrets created by LSC from scratch.   One example is LSC's "Breaks Management" systems, which consists of two sets of applications.   First, there are applications that interface with third party message queues and that read messages in the background and record the information in a database.   An example of such an application is "Real Time Clearance."   In addition, there are GUI applications that display the data to the user and allow LSC's staff to take action when required.   There are two main GUI applications that perform these functions: Breaks Management, which is used for equities, and "Dashboard" also known as "OCC Management," which is used for options contracts.   The purpose of both programs is to interpret messages which are read by other LSC applications and they allow LSC staff to resolve breaks and manage the firm's position at NSCC and OCC, respectively.

47.     Other examples of important proprietary, confidential LSC systems are:  LSC's message routing system RTR ("RTR"); LSC's Real-Time Tickets application ("RTT"); LSC's Settlement Management Tool ("FailSheet" or "Fail Management"); LSC's interface to the Society for Worldwide Interbank Financial Telecommunications ("SWIFT"), a messaging network that financial institutions use to securely transmit information and instructions through a standardized system of codes ("Wire Management"); LSC's customer accounts management system ("View Accounts"); and LSC's Stock Loan Management System.

- **RTR: Plaintiffs' Confidential and Proprietary Message Routing System**

48.     Once an order is received from a customer, LSC must communicate with various markets willing to take the other side of the customer's order, including stock and option exchanges and Electronic Communication Networks ("ECNs"), Alternative Trading Systems, Multilateral Trading Facilities, and dark pools (collectively, "Market Centers").

49.     In order for LSC to communicate with the Market Centers and process millions of transactions a day, LSC created a proprietary messaging system which includes its highly sophisticated and powerful message router known as RTR, which can handle over a million messages per second.

50.     Among other things, RTR ensures against duplicate orders and dropped messages; its processes are highly confidential, and the full scope of its capabilities are an important LSC/ROX Systems trade secret.  RTR lies at the heart of most of LSC's systems and facilitates the communication between some 200 computer programs that run every day that make LSC's overall clearing system function.

51.     RTR first went live in 1994, and was the brain child of Whitfield Gregg, Mr. Lek's long-time partner and co-founder of LSC.  Over the years, ROX Systems programmers have continued to make improvements to RTR.

- **Breaks Management: Plaintiffs' Confidential and Proprietary Function to Resolve Discrepancies Between Trades Known by the Market Centers and LSC's Internal Records**

52.     After executing transactions, LSC receives messages from the Market Centers as well as from the central counterparty to transactions, the National Securities Clearing Corporation ("NSCC") and Options Clearing Corporation ("OCC"), advising LSC of its obligations for settling the transaction.

53.    LSC developed its own proprietary "Breaks Management" system to process and reconcile these messages and fix "breaks" when there is a discrepancy between messages that needs to be resolved.  The predecessor to Breaks Management -- Balancer -- had been developed in-house by Whitfield Gregg and other LSC/ROX developers over the course of a number of years.  Breaks Management relies on the same fundamental LSC/ROX proprietary architecture as Balancer, but uses more efficient technology and links to Plaintiffs' RTR systems.   In addition, Louis and others wrote Breaks Management so that it could be integrated with NSCC's Universal Trade Capture, which is read by LSC's "Real Time Clearance" application.  Breaks Management allows users to see clearance breaks in real time instead of through batch file processing.

54.    Breaks Management includes sophisticated methods, procedures, and programs (including mathematical algorithms) to process and reconcile messages and resolve breaks.

55.    Firms that transact volume similar to that of LSC would typically employ as many as 50 people to handle this function.  Due to the efficiency of its Breaks Management system, LSC reduced this function to a one-half hour a day job.

56.    As part of the Breaks Management function, LSC developed proprietary applications that interface with the OCC that help manage LSC's clearing business with respect to options.  LSC also developed Dashboard or OCC Management, a GUI that allows LSC employees to effectively communicate with the OCC.

57.    Dashboard is a GUI that connects to numerous LSC processes.  Dashboard is exclusively used by LSC employees internally and is not available to LSC's competitors or customers.  LSC's competitors are therefore unable to determine what functions LSC performs with Dashboard.

58.     Most broker-dealer companies that perform clearing use industry standard GUIs provided by vendors. The OCC offers a platform called ENCORE, a user-friendly web-based system that broker-dealers can use to communicate with the OCC. ENCORE, however, is primarily designed for manual order input. Firms that use ENCORE, therefore, need to invest time and money towards the training of operations personnel to reconcile and interface with the OCC. ENCORE is not a feasible solution to firms that need to process thousands of messages. Therefore, firms are forced to either outsource to expensive third-party providers like Broadridge or FIS or hire droves of trained personnel to enter such volumes of data manually into terminals.

59.     Unlike ENCORE, Dashboard is a highly automated program. It requires just one user to communicate thousands of messages to the OCC with only a few clicks of a button. Where transactions might take hours using ENCORE, they take only seconds with Dashboard.

60.     Dashboard is not a client interfacing software. It was specifically designed for LSC employees to interface with the LSC and ROX databases, proprietary procedures/architecture, functions, systems, and controls, all from one screen. There are a number of critical OCC processes that run at LSC and ROX. These processes run in the background and interface with the Dashboard, allowing users to process thousands of messages in real time.

61.     As an employee of LSC, Fowler developed Dashboard, which was an upgrade to "Options Balancing," Plaintiffs' prior user interface that had been developed by another LSC employee. Development of Dashboard started in 2013 and has since then been continuously improved.

16

- **RTT: Real-Time Tickets Application**

62.     Through the use of LSC's confidential and proprietary application RTT, LSC merges information received from the Market Center, NSCC, and OCC messages along with customer information (such as commission rates and delivery instructions) and external information (such as SEC and exchange fee rates) to create a "ticket."

63.     LSC's tickets constitute a record of the order, the execution report, the income and expenses associated with a trade, and information concerning how the trade will be settled.

64.     Upon information and belief, LSC's ticket system – the information compiled and integrated in the ticket that LSC uses – is not replicated by other broker-dealers.

65.     RTT was developed in 2007 by another ROX programmer.  RTT replaced a system developed by Mr. Lek that had been in use since 1998.

- **Fail Sheet/Fail Management: LSC's Management of Fail-to-Deliver and Fail-to-Receive**

66.     After a trade is done, brokers must deliver securities that are sold and receive securities that have been purchased.  Often the stock of the same issuer is purchased and sold many times for the same settlement date.  Keeping track of delivery and payment obligations is a complicated task.  To manage this, LSC developed a proprietary system called the "Fail Sheet."

67.     Upon information and belief, LSC's Fail Sheet is not replicated by other broker-dealers.

68.     Fail Sheet replaced a program called "Cage Management," which was used to keep track of delivery and payment orders.  Mr. Lek wrote Fail Sheet and Louis worked with other senior LSC/ROX employees for a number of years in order to upgrade Cage Management to Fail Sheet.  The upgrade from Cage Management to Fail Sheet was based on the fundamental

LSC/ROX systems and controls developed by LSC over the last 25 years. Fail Sheet went live in or around 2005.

- **Wire Management: LSC's Interface to SWIFT**

69.     LSC developed a proprietary interface to SWIFT, called "Wire Management," in order to communicate seamlessly with banks all over the world (*i.e.*, issue wire instructions, receive advice of funds received, confirm foreign exchange transactions, instruct banks to receive or deliver securities).

70.     Other SWIFT interfaces are commercially available, but they typically cost millions of dollars a year to license and, upon information and belief, none are as efficient as Wire Management.

71.     Wire Management is the GUI interface to the SWIFT dynamic link library that was entirely developed by Whitfield Gregg. Louis developed Wire Management over the course of several years. Development of Wire Management started in 2010 and has since then been continuously improved.

- **View Accounts: LSC's Customer Account Maintenance System**

72.     Broker-dealers are required to collect detailed information concerning its customers and keep the information current.  Brokers must have detailed information on file concerning the identity of a customer and the customer's investment objectives.  To accomplish this task, LSC developed a customer account database.  The GUI to the accounts database, "View Accounts," was developed by LSC for use by its staff and is not available to other broker-dealers.

73.     View Accounts was developed over the course of many years by a variety of LSC's programmers.  The first version of View Accounts was developed by a ROX Systems

programmer in or around 1998.  Another ROX Systems programmer developed the second version of View Accounts in or around 2012.

74.     RTR, RTT, Breaks Management, Dashboard, Fail Sheet, Real Time Clearance, Wire Management, and View Accounts are all used, along with hundreds of other applications created by Plaintiffs, within LSC's clearing system.

75.     Louis and Fowler rewrote and/or upgraded many of the components of LSC's proprietary clearing system.   For example, Louis worked extensively on Fail Sheet/Fail Management and Breaks Management, which were the second versions of Cage Management and Balancer, respectively.   Fowler developed Dashboard, which was the second version of Options Balancing.  Louis and Fowler are experts in rewriting LSC code and upgrading LSC's proprietary clearing designs and both Louis and Fowler are intimately familiar with LSC's entire proprietary clearing system.

- **Stock Loan Management: LSC's Solution to Managing Its Security Borrowing and Lending Operations**

76.     Most broker-dealers rely on a third-party system to support their stock loan transactions (such as when their customers short securities and the broker dealer must borrow the security to make delivery).  The broker-dealer must borrow the security and track the terms of the stock loan.  To perform these transactions, almost all broker-dealers in the United States subscribe to and pay substantial fees for a service called Loanet, which provides the necessary tools to track and account for a stock loan.

77.     LSC and ROX Systems have, however, created a unique market advantage -- in addition to their proprietary stock and options clearing systems -- by developing a reliable, confidential, and proprietary application called "Stock Loan Management" that eliminates the need to use Loanet.  As a result, LSC does not need to pay Loanet's substantial fees and can

provide stock loan services to customers at substantially reduced costs and/or at a higher profit margin. Unlike Loanet, Stock Loan Management is an easy to use GUI that interfaces with dozens of LSC's proprietary processes that run in the background and ensure the proper delivery of securities loaned and borrowed. Louis spent considerable time and effort at LSC/ROX developing this Stock Loan Management application.

**ROX Systems' Copyright Ownership of LSC's Copyrights**

78.     Following execution of a Copyright Assignment Agreement between LSC and ROX Systems, dated December 27, 2007, LSC assigned its copyrights to ROX Systems under which ROX Systems became the holder of the copyrights protecting LSC's technology. These copyrights constitute ROX Systems' primary assets. Then, on August 27, 2018, ROX Systems registered all of its trading, order-routing, market data, and back-office control systems (the copyrights that had originally been assigned to it by LSC) with the United States Copyright Office. This includes all of the clearing technology that LSC uses and which Louis and Fowler helped to develop and/or upgrade.

79.     LSC is the largest licensee authorized to use that technology in its business applications and distribute programs using that technology. Certain ROX Systems products are also licensed to other broker-dealers, including Actinver Casa de Bolsa, S.A. de C.V., Grupo Financiero Actinver, Banorte, Punto Casa de Bolsa, BankAmerica, Merrill Lynch Mexico, Banco Santander Mexico, and BBVA Bancomer.

80.     ROX Systems' copyrights protect LSC's clearing technology and are for the sole benefit of LSC or other authorized licensees of the ROX copyrights. Notably, Volant does not hold a license to the trading, order-routing, market data, or back-office control systems that ROX has copyrighted.

20

**Steps Taken by Plaintiffs to Protect Their Trade Secrets**

81.     Plaintiffs have taken and continue to take substantial steps to safeguard their clearing system trade secrets.  For example, Plaintiffs' personnel are required to sign individual confidentiality agreements as a condition of their employment, as well as an annual acknowledgement that they have read and agreed to the policies set forth in the LSC Securities Compliance Manual and Written Supervisory Procedures ("LSC Manual"), which prohibits the taking of LSC's confidential information for personal gain.

82.     LSC restricts access to its proprietary clearing system, such that only those individuals with a clear business need are able to access it.  When one of these individuals leaves the firm, his or her access is terminated immediately.  The system itself is password protected and the passwords are changed on a regular basis.

83.     Plaintiffs' physical offices contain servers that are locked and secured by fingerprint readers and continuously monitored by a closed circuit television feed, which can be accessed remotely online.

84.     Information contained on LSC's private network can only be accessed through a virtual private network which is doubly secured by a two-factor authentication requirement that requires both a password and confirmation of a unique code sent directly to the cell phone of the authorized user.

85.     Plaintiffs also hire outside auditors to conduct regular audits to ensure the confidentiality and security of their systems and source codes.

**Louis's Employment History and His Non-Compete and Confidentiality Agreements**

86.    Louis was hired by LSC in 2004.  Prior to joining LSC, Louis worked at Credit Agricole Indosuez and in the mergers and acquisitions department at Rothschild Bank.

87.    Upon information and belief, prior to joining LSC, Louis never had experience with broker-dealer back-office systems.

88.    On April 1, 2004, Louis and LSC entered into a Non-Compete and Confidentiality Agreement ("Louis Non-Compete and Confidentiality Agreement").  Among other things, in the Louis Non-Compete and Confidentiality Agreement, Louis acknowledged that LSC's computer products, operational methods, and business affairs were "Confidential Information," "not readily available to the public," and constituted "trade secrets" of LSC.

89.    Under the terms of the Louis Non-Compete and Confidentiality Agreement, Louis further agreed that, both during and after his engagement with LSC, he would keep LSC's Confidential Information secret and not reveal it outside of the company, would not make use of the Confidential Information for his own purposes or for the benefit of anyone other than LSC, and, upon termination of his engagement with LSC, would return all software, data, and documents relating to LSC's Confidential Information in his possession.

90.    Under the terms of the Louis Non-Compete and Confidentiality Agreement, Louis also agreed that for the period of 18 months after ceasing employment with LSC, he would not be employed or work in any capacity similar to the capacity of his work for LSC or work for a firm "involved in the creation . . . of software for use by companies in the securities industry in connection with trading on any national stock exchange, absent prior written approval from [LSC]."

91.     Under the terms of the Louis Non-Compete and Confidentiality Agreement, Louis agreed that any violation of the covenant not to disclose Confidential Information or the covenant not to compete for 18 months post-employment would result in irreparable injury to LSC. Relatedly, Louis consented to the granting of a restraining order and/or injunction in favor of LSC "in the event of an alleged violation" and agreed to pay LSC's reasonable attorney's fees and costs in the event that LSC prevails on a claim "for breach of one or both of these covenants."

92.     Under the terms of the Louis Non-Compete and Confidentiality Agreement, Louis agreed that all work which he created during his employment at LSC – relating to LSC's products or in which LSC's time, materials or facilities were used – are considered to be "works made for hire" and that he has no proprietary interest in those developments, designs, inventions, improvements, or trade secrets.

93.     During his 14-year employment at LSC, Louis rose to become LSC's President and oversaw all operational functions of LSC, including the development of LSC's clearing system.

**Fowler's Employment History and His Non-Compete and Confidentiality Agreements**

94.     Fowler was hired by LSC in 2011 shortly after he graduated from college. Upon information and belief, prior to joining LSC/ROX Systems, Fowler did not have any work experience with broker-dealer clearing systems or the securities industry.

95.     On October 10, 2011, Fowler entered into a "Non-Compete and Confidentiality Agreement" with LSC ("Fowler Non-Compete and Confidentiality Agreement," together with Louis Non-Compete and Confidentiality Agreement, the "Non-Compete and Confidentiality Agreements"). Among other things, in the Fowler Non-Compete and Confidentiality

23

Agreement, Fowler acknowledged that LSC's computer products, operational methods, and business affairs were "Confidential Information," "not readily available to the public," and constituted "trade secrets" of LSC.

96.    Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler further agreed that, both during and after his engagement with LSC, he would keep LSC's Confidential Information secret and not reveal it outside of the company, would not make use of the Confidential Information for his own purposes or for the benefit of anyone other than LSC, and, upon termination of his engagement with LSC, would return all software, data, and documents relating to LSC's Confidential Information in his possession.

97.    Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler also agreed that for the period of 18 months after ceasing employment with LSC, he would not be employed or work in any capacity similar to the capacity of his work for LSC or work for a firm "involved in the creation . . . of software for the trading of securities or order entry and routing, which competes with the Company, absent the prior written permission of [LSC]."

98.    Further, under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler agreed that for a period of 18 months after ceasing employment with LSC he would not "directly or indirectly solicit or perform services for...any person or entity that was a Client or Potential Client of the Company during [his] [Fowler's] employment."

99.    Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler agreed that any violation of the covenant not to disclose Confidential Information or the covenant not to compete for 18 months post-employment would result in irreparable injury to LSC. Relatedly, Fowler consented to the granting of a restraining order and/or injunction in

favor of LSC "in the event of any alleged violation" and agreed to pay LSC's reasonable attorney's fees and costs in the event that LSC prevails on a claim "for breach of one or both of these covenants."

100.   Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler agreed that all work which he created during his employment at LSC – relating to LSC's products or in which LSC's time, materials or facilities were used – are considered to be "works made for hire" and that he has no proprietary interest in those developments, designs, inventions, improvements, or trade secrets.

101.   As a highly compensated computer programmer and operations manager, Fowler's primary role with LSC/ROX Systems was to create and develop code and other technology for use in LSC's business.   ROX Systems' primary purpose was to develop technology for the benefit and use of LSC and other authorized licensees, and Fowler was expressly advised that any work he performed for ROX Systems was for the benefit of LSC. Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler acknowledged that the internal design and computer code were "Confidential Information," "not readily available to the public," and constituted "trade secrets."

102.   Fowler agreed that, both during and after his relationship with LSC/ROX Systems, he would keep Confidential Information secret and would not make use of the Confidential Information for his own purposes or the benefit of anyone else other than for the purpose of direct orders through ROX Systems' programs for execution by LSC.  In addition, Fowler agreed that, at the termination of his relationship with LSC/ROX, he would deliver promptly to LSC/ROX all software, data, memoranda, notes, records, and other documents "constituting or relating to such Confidential Information which [he] may then possess."

103.    Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler agreed that all work which he created based on code and code objects received from LSC/ROX Systems shall be considered to be "a derivative work" and that he is prohibited from using it to compete with products offered by LSC/ROX Systems.

104.    During his six years of employment with LSC/ROX, Fowler worked extensively on writing and improving the source code for LSC's clearing system.  He was also the main architect of the Dashboard.

**Louis's and Fowler's Unique Roles at LSC and ROX Systems**

105.    When Louis and Fowler began working for LSC, they had no background in the clearing industry and no experience in designing clearing systems.  To the contrary, LSC and ROX Systems taught them how the clearing business worked as well as LSC and ROX Systems' unique methods for processing transactions.

106.    According to their broker registration histories, the first financial firm with which either Louis or Fowler registered is LSC, and it was the only firm at which either was registered through February 2019.[2]  Louis and Fowler completed financial certifications while employed at LSC that authorize them to sell and trade securities, manage financial companies, and supervise financial service personnel and compliance issues.

107.    Louis and Fowler were highly compensated for their work, receiving millions of dollars over their collective tenure.  Throughout the duration of their employment with LSC/ROX, each of the Former Employees had access to, and used, Plaintiffs' confidential and proprietary information.

---

[2] Louis's broker registration history can be viewed at https://brokercheck.finra.org/individual/summary/4785115; Fowler's broker registration history can be viewed at https://brokercheck.finra.org/individual/summary/6027105.

108.    In 2017, as they had in prior years, Louis and Fowler acknowledged that they received, read, and agreed to the policies and procedures in the LSC Manual.  The LSC Manual prohibits the taking of "non-public information (such as processes, programs, software, and business information and plans) about [LSC] or its businesses" for personal gain or competition with LSC.

109.    Together, Louis and Fowler have a complete understanding of nearly every aspect of Plaintiffs' business, including the highly confidential software source code and the highly confidential clearing system.  In short, Louis and Fowler possess information that is critically important to Plaintiffs.

110.    With the confidential information and trade secrets that Louis and Fowler have learned during their employment with LSC, and the source code that, upon information and belief, they have transferred to computers and storage media they control, they have the ability to copy and re-create Plaintiffs' valuable and proprietary clearing technology for another broker-dealer.  Since neither Louis nor Fowler had any outside experience using other clearing systems, all of their knowledge and skill is specific to recreating and upgrading LSC/ROX System's proprietary technology.

**Louis and Fowler Initiate Operation Secret Octopus**

111.    On April 3, 2017, Fowler set up a dinner meeting between Mr. Lek and an executive at B. Riley, to discuss ways in which B. Riley could acquire and/or license Plaintiffs' clearing and stock loan management technology.

112.    Upon information and belief, B. Riley sought to obtain LSC and/or Plaintiffs' clearing technology and stock loan management technology in order to reduce the significant cost that it paid to its clearing firms and to Loanet.  Upon information and belief, B. Riley did not

27

have the technology to offer clearing services to its customers and was required to use third-party clearing houses at a significantly higher clearing cost than LSC incurs.

113. Shortly after the dinner meeting, Mr. Lek met with B. Riley's founder and CEO to negotiate the terms of a deal.

114. The deal collapsed but B. Riley's desire to acquire Plaintiffs' proprietary technology endured. In a meeting on or about December 2017, a B. Riley executive told Mr. Lek that B. Riley was going to go "clearing," "with you or without you."

115. By December 2017, Louis and Fowler were already concocting a secretive plan -- that they, in emails, codenamed "Operation Secret Octopus" -- to recreate LSC's proprietary clearing system at B. Riley. Upon information and belief, Louis and Fowler prepared a "Confidential Memorandum" which detailed Louis' and Fowler's scheme to leave LSC and recreate in just one (1) year what it had taken Plaintiffs 25 years to develop. As described in the Confidential Memorandum, the plan depended on Louis and Fowler who possessed the "knowledge of the 'how-to' as it [the Louis and Fowler duo] has already built the applications used in a production environment today." Louis and Fowler were well aware of the value of LSC's proprietary clearing technology and their knowledge of that technology. Upon information and belief, during communications with Fowler related to Operation Secret Octopus, Louis stated that "[w]e ARE the clearing part of Lek," and that his and Fowler's plan to leave LSC and recreate Plaintiffs' clearing system at B. Riley was "likely going to put Lek out of business." Despite this knowledge, Louis and Fowler persisted.

**Louis's Resume Makes Clear That He Was Touting Knowledge of LSC's Trade Secrets**

116. Louis's and Fowler's plan to work for B. Riley evolved throughout the Spring of 2018. Upon information and belief, by May 2018, Louis and Fowler had submitted their resumes to B. Riley. Tellingly, Louis's resume did not refer to any general knowledge he might

possess about back-office processes used in the securities industry. Instead, his resume explicitly listed LSC/ROX applications by name:

- "Stock Loan Management;"
- "Fails Management;"
- "OCC Management;"
- "Wire Management;" and
- "Real Time Clearing Monitor."

117. Louis's reference to these LSC/ROX applications by name is odd given that these terms are not industry specific terms and are virtually meaningless outside of LSC/ROX.

118. Louis also admitted the proprietary nature of the LSC/ROX systems in his resume, writing: "Build and manage relationships with clients: assist Sales in demonstrating ROX, Lek Securities proprietary trading platform (Client presentation) as well as provide feedback to developers to make continuous improvements to the system (pair trading, strategy, OMS, Multi-currency support, system optimization, etc.)."

**Louis and Fowler Submit Resignation Letters and Fowler
Announces Their Plan to Replicate LSC's Clearing Technology**

119. Secrecy remained of the utmost importance. When, in May 2018, B. Riley informed Louis and Fowler of their pending background checks, Louis told B. Riley that "[j]ust to state the obvious, this background check CANNOT involve calling Lek and asking about us. Nobody is aware that we might be leaving and it would be dramatic if Sam were to learn this way, when we still don't have an agreement in place."

120. On May 25, 2018, in an email addressed to Louis and Fowler's personal email addresses, B. Riley made a joint offer of employment to Louis and Fowler ("Offer"). Louis was offered a position as "Managing Director, Business Transformation" and Fowler was offered a

position as "Director, Business Transformation." The single Offer, directed to both Louis and Fowler, included a list of duties to be "split between the two" including, "defining the business transformation and providing the technical capabilities required to enable that transformation." In addition to cash compensation, the Offer indicated that Louis and Fowler would receive Restricted Stock Units.

121.    Fowler then took additional steps to optimize the success of Operation Secret Octopus. First, Fowler purchased with his own money a new powerful workstation computer (the "Workstation"). Then, on Saturday, June 9, 2018 -- just two days before Fowler and Louis resigned from LSC -- Fowler contacted LSC's Chief Information Security Officer ("CISO") in order to have the CISO walk Fowler through the steps necessary to connect the Workstation to Plaintiffs' virtual private network ("VPN"). Fowler often worked from his home in Missouri, so there was nothing unusual about giving Fowler remote access to Plaintiffs' network.

122.    What was unusual, however, was Fowler's response. After Fowler verified that his Workstation was connected to Plaintiffs' network, Fowler sent the CISO a text that said, "Now I can copy all my code to my new machine for when I quit!! Lol."

123.    Unfortunately, this was no joke. Fowler's text was a foreshadowing of events to come -- Fowler's imminent resignation and the steps he would take to implement Operation Secret Octopus.

124.    The following business day, on Monday, June 11, 2018, Louis and Fowler asked to meet jointly with Mr. Lek in his private office. During the meeting, Louis announced that: "We are both leaving, and we are both going to Riley to make them [B. Riley] self-clearing." Then Fowler and Louis submitted nearly identical letters of resignation to Mr. Lek "effective

July 13, 2018" ("Letters of Resignation"), along with a copy of the joint Offer, and orally informed Mr. Lek that they had accepted the Offer.

125.   LSC had been unaware of the Offer or that Louis and Fowler were even considering leaving LSC until they tendered their Letters of Resignation.

126.   Because Louis and Fowler were so instrumental to the daily operations of LSC, LSC was constrained to continue employing Louis and Fowler until their temporary replacements could be trained so as not to jeopardize LSC's daily business or cause disruptions to LSC's customers.  However, Louis's and Fowler's job responsibilities after June 11, 2018 were limited to transitioning their former responsibilities to other employees of LSC/ROX. After June 11, 2018, neither Louis nor Fowler were authorized to take any action on behalf of LSC/ROX.

127.   Louis and Fowler were aware of the terms of their Non-Compete and Confidentiality Agreements when they received the Offer, submitted the Letters of Resignation, and accepted the Offer in violation of the Non-Compete and Confidentiality Agreements.

128.   On or around June 13, 2018, Fowler approached Mr. Lek on the trading floor at Plaintiffs' office ("June 13 Discussion").  Charles Lek, Mr. Lek's son and a Managing Director of LekUK, an affiliate of LSC, also participated in part of the June 13 Discussion.  An audio and visual recording of the discussion was generated by an automated recording system on the trading floor.

129.   In the June 13 Discussion, Mr. Lek told Fowler that he should have arranged for B. Riley to license the technology.  Fowler responded that any licensing deal would probably be "a harder thing to pitch," because by hiring Louis and himself, B. Riley would get Plaintiffs' technology for "next to nothing."

130.    In further discussions between Fowler and Mr. Lek on June 27, 2018, Fowler told Mr. Lek that his first job at B. Riley would be to recreate LSC's stock loan management program and then recreate LSC's clearing operations.   Fowler boasted that he had been promised a $75,000 bonus from B. Riley upon completion of the re-write of LSC's stock loan management program.

131.    After receiving the Resignation Letters, Plaintiffs discovered that certain clearing system source code created by Louis was missing and was never checked into the secure location that Plaintiffs use to store all of its source code (Microsoft Visual Source Safe and/or Microsoft Visual Studio Online/Team Foundation Server).   Upon information and belief, the version 1.0.1.0. of this source code was removed from Plaintiffs' offices and/or its networks, computers, and any other devices or account in Plaintiffs' control by Louis and/or Fowler for their own benefit and/or for the benefit of a future employer.

132.    After receiving the Former Employees' Resignation Letters, the CISO reviewed a screenshot of Fowler's computer he had previously received from Fowler on Saturday, June 9, 2018, and realized that Fowler's Workstation desktop showed only a few icons next to the recycling bin and Google Chrome web browser link, including Microsoft Visual Studio Online (the secure location that Plaintiffs use to store all of its source code), Dropbox (a personal cloud storage website), and Signal (an encrypted text application that deletes all text messages after they are received and recently discovered to be used by Louis).   Upon information and belief, Fowler could use these three icons to easily access all of Plaintiffs' source code, deposit it into a personal Dropbox account, and communicate with Louis without detection.

133.    After receiving the Resignation Letters, Plaintiffs also discovered that Louis's work computer contained all of Plaintiffs' source code, including programs he did not work on

and programs written in C++ and C#, which are computer languages with which, on information and belief, Louis has only limited familiarity.

134.    Notably, in the Confidential Memorandum, Louis notes that the new clearing "[a]pplication will be written in C#."

135.    Upon information and belief, there was no legitimate business reason for Louis to have had all of Plaintiffs' source code on his computer.  The only reasonable purpose for this was to enable Louis to more easily copy the source code files to a location outside of LSC/ROX control.

136.    Plaintiffs further discovered that, both inside and outside of Plaintiffs' offices, Louis actively encouraged Plaintiffs' employees to seek employment elsewhere and, without basis, used his position as LSC's President to falsely tell Plaintiffs' employees that (1) LSC was in such financial trouble that it was not going to survive past August of 2018, (2) there was not enough money to pay salaries, and (3) Mr. Lek had emptied his IRA to keep Plaintiffs open for business.

**Louis's and Fowler's Work on Microsoft Azure**

137.    After the delivery of the Resignation Letters, Fowler told Mr. Lek that he intended to use Microsoft Azure, a cloud computing software, for the clearing system that B. Riley was hiring him to replicate.  In essence, on information and belief, Fowler planned to migrate to cloud computing the same type of proprietary system that LSC had created on linked personal computers and servers.

138.    Notably, in the spring of 2018, Louis appears to have used an LSC credit card to purchase an Azure subscription that is accessed solely through his personal email address and no

other LSC/ROX Systems employee is believed to have had access or the password to that account at that time (other than perhaps Fowler).

139.    Upon information and belief, Louis acquired the Microsoft Azure service for his and Fowler's personal benefit – even though he charged the expense to LSC – because LSC did not use Azure for its clearing purposes at that time.

140.    In or about April of 2018, Louis informed LSC's CISO that he was running clearing technology and database tests in a cloud based system on the Azure account he created and used software on LSC's systems to access the Azure resources he created while employed by LSC.  Upon information and belief, some of this technology does not reside on Plaintiffs' networks, computers, or any other device or account in Plaintiffs' control.

141.    Louis claimed he was undertaking this work on Azure to compare the time it takes to process certain data using cloud based technology with the time it took to process the data using on-site servers at LSC and ROX Systems.

142.    At the time, Plaintiffs did not intend to use Microsoft Azure to run its clearing system.  Moreover, it was contrary to company procedures to handle LSC data on personal accounts instead of accounts under Plaintiffs' control.  The CISO challenged what Louis was doing, but Louis assured him that as President he was authorized to undertake the work he was doing in Azure.  Nonetheless, Louis said he would cease using his personal Microsoft Azure account and rebuild what he was doing on new LSC Microsoft Azure accounts that the CISO would set up.  Once the new LSC Microsoft Azure account was established, however, Louis did not build comparable systems on it.

143.    After the new LSC Microsoft Azure account was established, the CISO overheard Louis having private telephone calls from Mr. Lek's office in which Louis was discussing

Microsoft Azure on multiple occasions. Mr. Lek was not in his office when Louis made these private calls. The CISO observed that, when the telephone conversations ended, both Mr. Lek's line and Fowler's phone lines reflected that calls had ended – such that it appeared that Louis and Fowler (who had calls forwarded to his St. Louis home office) were secretly discussing Microsoft Azure.

144.    The CISO examined Louis's and Fowler's computer desktops and determined that, in fact, both were accessing a shared Microsoft Azure account from their desktops.

145.    On July 11, 2018, after Louis and Fowler announced their resignations, the CISO overheard Louis discussing Azure accounts on a telephone call with Fowler at Plaintiffs' offices.

146.    Because LSC was compensating Louis and Fowler for all work that they undertook prior to their separation from LSC, any and all work Louis and Fowler undertook concerning Azure's and cloud computing's benefits for clearing operations – though not disclosed to Plaintiffs – belong to LSC and ROX Systems.

**Louis's and Fowler's Final Days at LSC**

147.    Further, Fowler also admitted that B. Riley was aware of Louis's and Fowler's Non-Compete and Confidentiality Agreements.

148.    July 13, 2018 was Louis's and Fowler's last day of employment with LSC/ROX.

149.    On July 13, 2018, Louis returned his LSC laptop to Plaintiffs' CISO and admitted to the CISO that he had erased all of its contents. Louis was aware that LSC was then involved in pending litigation and had been directed to preserve all LSC documents and electronic information.

150.    On July 13, 2018, shortly after Louis returned his erased LSC laptop to Plaintiffs' CISO, Mr. Lek concluded that the Former Employees' last day of work at Plaintiffs would be

accelerated and instructed them in writing not to access, delete, or alter any of Plaintiffs' property, documents, and information, including devices containing Plaintiffs' information, and to return any such items immediately.

151.    On July 13, 2018, Plaintiffs' counsel wrote to B. Riley to demand that they provide immediate assurances that B. Riley would rescind its employment offers to Louis and Fowler and to further agree not to tortiously interfere with LSC's contracts, misappropriate or use LSC's trade secrets, or unfairly compete with LSC using LSC's confidential information and personnel.

152.    On July 13, 2018, Plaintiffs' counsel also emailed Louis and Fowler to demand that they each provide immediate assurances to LSC that they would abide by the terms of their respective Non-Compete and Confidentiality Agreements and not misappropriate or use LSC's trade secrets or unfairly compete with LSC by using LSC's confidential information ("Louis and Fowler Cease and Desist Letters").

153.    B. Riley promptly agreed not to hire Louis and Fowler, and rescinded their employment offers.   B. Riley also voluntarily produced emails disclosing the existence of Operation Secret Octopus.

**Louis's and Fowler's Plan to Create A Clearing System for Volant**

154.    Following their departure from LSC and ROX, Louis and Fowler engaged in some discussions with LSC; however, when the parties could not reach a resolution, Louis's and Fowler's counsel ceased communicating with LSC's counsel.

155.    LSC hoped that Louis and Fowler would abide by their contractual obligations and were unaware of any further efforts to breach those obligations following B. Riley's

recission of their employment offers until January 2019, when LSC's former lawyer Schiffman contacted Mr. Lek on behalf of Volant.

156.    LSC had been a client of Volant's for almost two (2) years.  LSC routed orders under options contracts to Volant so that Volant could either execute the orders or route them to another party.

157.    On or around January 14, 2019, Schiffman called Mr. Lek and informed him that he was representing Volant and Volant was planning to hire Louis and Fowler as a pair to create a clearing system for Volant.  Schiffman noted that Volant was aware that Louis and Fowler had non-competition and confidentiality agreements, but that Volant intended to hire them anyway to, in part, create a clearing system for Volant.

158.    LSC's counsel promptly wrote to Schiffman and Schulte to demand that Volant not tortiously interfere with LSC's agreements with Louis and Fowler and not misappropriate LSC's trade secrets.  LSC's counsel further expressed concern that Schiffman could not represent Volant in this matter in light of his prior representation of LSC and his knowledge of LSC/ROX's trade secrets.

159.    Upon information and belief, Fowler previously informed Volant of the existence of at least certain aspects of LSC's/ROX's proprietary technology.  In or around late Spring of 2018, Fowler demonstrated LSC's proprietary systems to Volant.  Then, in or around June or July of 2018, Fowler admitted to Charles Lek while on the trading desk that he had demonstrated LSC/ROX's Dashboard to Volant.

160.    Upon information and belief, Louis and Fowler will soon begin working at Volant (if they have not already begun to work there).[3]  Upon information and belief, notwithstanding

---

[3] As stated above, *see* Footnote 1 *supra*, Plaintiffs just learned that Fowler registered with Volant Execution as of March 6, 2019.

the fact that Volant has been made aware of the Former Employees' post-employment restrictive covenants, Volant has offered employment positions to the Former Employees which would require them to perform the same types of responsibilities as they performed as employees of LSC and to utilize the same confidential trade secret information they learned as a result of their employment with LSC. In doing so, among other things, Volant has tortiously interfered with Plaintiffs' contractual relationships with Louis and Fowler.

161.   Upon information and belief, one of Volant's improper goals was and is to obtain the clearing technology from Plaintiffs without paying fair market value for it. Volant determined it could accomplish this goal by hiring LSC's former President and computer programmer/operations manager to replicate the technology.

162.   Upon information and belief, another one of Volant's improper goals was and is to obtain an unfair competitive advantage over LSC and use that advantage to harm LSC's business.

163.   Upon information and belief, Volant has exploited, and continues to exploit, certain of Plaintiffs' confidential and proprietary information that Louis and Fowler obtained during their employment.

## COUNT ONE
## AGAINST THE DEFENDANTS
(Violations of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*)

164.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

165.   Defendants' actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

166.   Upon information and belief, Defendants possess confidential information belonging to Plaintiffs including source code, the design of LSC's unique and proprietary clearing system, and strategic business information that constitute trade secrets.

167.   Such information is used in connection with LSC's broker-dealer services, which are offered across the country and throughout the world.

168.   Plaintiffs have taken extensive measures to guard the secrecy of their clearing system including limited employee access to Plaintiffs' source code, outside auditing of source code security and systems, fingerprint reader access and CCTV monitored server rooms, changed passwords for departing employees, two-factor authentication for VPN access to Plaintiffs' private secure network, and the requirement that personnel sign confidentiality agreements.

169.   Louis and Fowler were subject to provisions designed to protect the proprietary and confidential nature of certain information belonging to Plaintiffs contained in the Non-Compete and Confidentiality Agreements and the LSC Manual.

170.   Upon the termination of their employment with LSC/ROX, Louis and Fowler had no right to retain or use any of Plaintiffs' trade secrets or confidential information.

171.   Louis and Fowler's retention of any of Plaintiffs' trade secrets or confidential information violates the Non-Compete and Confidentiality Agreements and the LSC Manual.

172.   Upon information and belief, Louis and Fowler are retaining Plaintiffs' trade secrets or confidential information and using that information to compete with and/or otherwise harm Plaintiffs.

173.   Upon information and belief, Volant has obtained and is using Plaintiffs' trade secrets or confidential information to unfairly compete with and/or otherwise harm Plaintiffs.

174.    Plaintiffs have not consented to Defendants' use of Plaintiffs' trade secrets or confidential information.

175.    Defendants' conduct constitutes knowing, willful, and malicious misappropriation.

176.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendants will cause further irreparable injury to LSC/ROX Systems.

177.    Plaintiffs are entitled to an order enjoining Louis and Fowler from working for Volant on clearing systems.

178.    Plaintiffs are entitled to injunctive relief enjoining the Defendants, their agents, and all persons acting in concert or participation with them, from engaging in any further use of Plaintiffs' confidential and proprietary information, requiring them to turn over any and all copies of such information, wherever located, to Plaintiffs, and requiring that they certify to the Court that they have permanently deleted or destroyed all copies of such information that they created that are not capable of being turned over, such as information located in cloud storage.

179.    As a result of Defendants' actions, Plaintiffs have suffered direct and consequential damages, and are entitled to recover exemplary monetary damages, in an amount to be proven at trial, and reasonable attorney's fees pursuant to 18 U.S.C. §1836.

**COUNT TWO**
**AGAINST THE DEFENDANTS**
(Copyright Infringement, 17 U.S.C. § 412, *et seq.*)

180.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

181.    LSC's and ROX System's source code and software was entirely authored by Plaintiffs.

182.    Plaintiffs have complete ownership over the source code and have obtained copyright registration for it.

183.    Upon information and belief, Louis and Fowler have willfully copied the contents of said source code and are using it without Plaintiffs' permission.

184.    Plaintiffs are entitled to damages, costs, and reasonable attorneys' fees against Defendants.

185.    In addition, all the Volant Defendants are jointly and severally liable for this copyright infringement under alter ego principles.

### COUNT THREE
### BY LSC AGAINST LOUIS
(Breach of Contract)

186.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

187.    Louis agreed to be bound by the terms of the Non-Compete and Confidentiality Agreements, which was a valid and enforceable contractual agreement.

188.    Plaintiffs performed all of their obligations thereunder.

189.    Upon information and belief, Louis breached his obligations under the Louis Non-Compete and Confidentiality Agreement by, among other things, failing to return Plaintiffs' confidential and proprietary information to LSC when their employment terminated.

190.    Upon information and belief, Louis further breached his obligations under the Louis Non-Compete and Confidentiality Agreement by, among other things, using Plaintiffs' confidential and proprietary information for his own purposes.

191.    Louis breached his obligations under the Louis Non-Compete and Confidentiality Agreement by, among other things, accepting employment with Volant within 18 months of the termination of his employment from LSC.

192.    Pursuant to the Louis Non-Compete and Confidentiality Agreement, Louis continues to be bound by its terms after the termination of his employment with LSC.

193.    Upon information and belief, Louis has violated his obligations under the Louis Non-Compete and Confidentiality Agreement by disclosing Plaintiffs' confidential information.

194.    As a direct and proximate result of Louis's wrongful conduct, Plaintiffs have been substantially and irreparably harmed.  Unless restrained by this Court, Louis will cause further irreparable injury to Plaintiffs.

195.    Plaintiffs are entitled to injunctive relief enjoining Louis, his agents, and all persons acting in concert or participation with him, from engaging in any further use of Plaintiffs' proprietary and confidential information, requiring him to turn over any and all copies of such information, wherever located, to Plaintiffs, and requiring that he certify to the Court that he has permanently deleted or destroyed all copies of such information that he created that are not capable of being turned over such as information located in cloud storage.

196.    Upon information and belief, as a direct result of Louis's multiple breaches of his contractual obligations under the Louis Non-Compete and Confidentiality Agreement, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT FOUR
## BY LSC AGAINST FOWLER
(Breach of Contract)

197.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

198.   Fowler agreed to be bound by the terms of the Fowler Non-Compete and Confidentiality Agreement, which was a valid and enforceable contractual agreement.

199.   Plaintiffs performed all of their obligations thereunder.

200.   Upon information and belief, Fowler breached his obligations under the Fowler Non-Compete and Confidentiality Agreement by, among other things, failing to return Plaintiffs' confidential and proprietary information to LSC when his employment terminated.

201.   Upon information and belief, Fowler further breached his obligations under the Fowler Non-Compete and Confidentiality Agreement by, among other things, using Plaintiffs' confidential and proprietary information for his own purposes.

202.   Fowler breached his obligations under the Fowler Non-Compete and Confidentiality Agreement by, among other things, competing with LSC within 18 months of the termination of his relationship with LSC.

203.   Pursuant to the Fowler Non-Compete and Confidentiality Agreement, Fowler continues to be bound by its terms after the termination of his employment with LSC.

204.   Upon information and belief, Fowler has violated his obligations under the Fowler Non-Compete and Confidentiality Agreement by disclosing Plaintiffs' confidential information.

205.   As a direct and proximate result of Fowler's wrongful conduct, Plaintiffs have been substantially and irreparably harmed.  Unless restrained by this Court, Fowler will cause further irreparable injury to Plaintiffs.

206.   Plaintiffs are entitled to injunctive relief enjoining Fowler, his agents, and all persons acting in concert or participation with him, from engaging in any further use of Plaintiffs' proprietary and confidential information, requiring him to turn over any and all copies of such information, wherever located, to Plaintiffs, and requiring that he certify to the Court that

he has permanently deleted or destroyed all copies of such information that he created that are not capable of being turned over such as information located in cloud storage.

207.    Upon information and belief, as a direct result of Fowler's multiple breaches of their contractual obligations under the Fowler Non-Compete and Confidentiality Agreement, Plaintiffs have been damaged in an amount to be proven at trial.

**COUNT FIVE**
**AGAINST LOUIS AND FOWLER**
(Misappropriation)

208.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

209.    LSC has contracts with Louis and Fowler that prohibit them from disclosing or using LSC's confidential and proprietary information.

210.    Louis and Fowler also agreed to the terms of the LSC Manual which prohibited the taking of non-public information about LSC for personal gain or competition with LSC.

211.    Plaintiffs' clearing system, which avoids the need for a costly mainframe system, is a novel trade secret that is not known outside of Plaintiffs' businesses and has not been replicated or used by LSC's competitors.

212.    Plaintiffs' clearing system is a software system used to facilitate millions of financial transactions every day.

213.    Plaintiffs have taken extensive measures to guard the secrecy of their clearing system, including limited employee access to Plaintiffs' source code, outside auditing of source code security and systems, fingerprint reader access and CCTV monitored server rooms, changed passwords for departing employees, two-factor authentication for VPN access to Plaintiffs' private secure network, and the requirement that personnel sign confidentiality agreements.

214.    Plaintiffs' clearing system technology gives LSC a competitive advantage over its competitors, is highly valuable, and they are highly valuable to Plaintiffs' competitors.

215.    Plaintiffs hired personnel and spent millions of dollars over many years to create, develop, and refine Plaintiffs' clearing system technology and the hundreds of applications that work together to make it operate.

216.    Plaintiffs' clearing technology cannot be easily replicated without having first-hand knowledge of, and experience with, how the system was developed, how it operates, and the details of the numerous applications that are needed to work together to make the system function.

217.    Upon information and belief, Louis and Fowler misappropriated Plaintiffs' source code and other confidential information related to Plaintiffs' clearing system and they are using it (or plan to use it) to re-create that technology for Volant.

218.    Upon information and belief, as a direct result of Louis and Fowler's wanton and willful conduct, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to punitive damages.

### COUNT SIX
### <u>AGAINST THE VOLANT DEFENDANTS</u>
(Tortious Interference with Contract)

219.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

220.    LSC has contracts with its employees that prohibited them from disclosing or using Plaintiffs' confidential and proprietary information.

221.    Under the terms of the Louis Non-Compete and Confidentiality Agreement, Louis agreed that for the period of 18 months after ceasing employment with LSC, he would not be

employed or work in any capacity similar to the capacity of his work for LSC or work for a firm "involved in the creation . . . of software for use by companies in the securities industry in connection with trading on any national stock exchange, absent prior written approval from [LSC]."

222.    Under the terms of the Fowler Non-Compete and Confidentiality Agreement, Fowler agreed that for the period of 18 months after ceasing employment with LSC, he would not be employed or work in any capacity similar to the capacity of his work for LSC or work for a firm "involved in the creation . . . of software for the trading of securities or order entry and routing, which competes with the Company, absent the prior written permission of [LSC]."

223.    At all relevant times to this cause of action, Volant knew of Louis's and Fowler's contractual obligations.

224.    Upon information and belief, Volant tortiously interfered with Louis's and Fowler's Non-Compete and Confidentiality Agreements by, inter alia: (a) soliciting Louis and Fowler to disclose and use Plaintiffs' confidential and proprietary information for Volant's benefit, and (b) hiring Louis and Fowler to perform similar functions for Volant to the functions that they had performed for Plaintiffs in order to help Volant unfairly compete with Plaintiffs. Volant engaged in this tortious conduct with the intent of causing damage to the Plaintiffs.

225.    Upon information and belief, as a direct result of Volant's wanton and willful conduct, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to punitive damages.

## COUNT SEVEN
## AGAINST LOUIS
(Breach of Fiduciary Duty and Duty of Loyalty)

226.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

227.    As the former President of LSC, Louis owed ongoing fiduciary duties and a duty of loyalty to LSC.  These duties continued after Louis ceased being employed by Plaintiffs.

228.    Louis received confidential information provided to him by LSC/ROX in the course of his employment.

229.    Upon information and belief, after Louis ceased employment at LSC/ROX, he provided confidential information he obtained from Plaintiffs to Volant for his personal benefit or for the benefit of Volant.

230.    Upon information and belief, as a direct result of Louis's conduct contrary to the interests of Plaintiffs, Plaintiffs have lost a competitive advantage to Volant which, unless enjoined by the court, will result in lost business opportunities, customers, fees, and the devaluing of the Plaintiffs.

231.    Upon information and belief, as a direct result of Louis's wanton and willful breach of his ongoing fiduciary duties to LSC, LSC and ROX have been damaged in an amount to be proven at trial and are entitled to punitive damages.

## COUNT EIGHT
## AGAINST FOWLER
(Breach of Duty of Loyalty)

232.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

233.    As a former employee of Plaintiffs, Fowler owed an ongoing common law duty of loyalty to Plaintiffs with respect to the confidential information he was privy to during his employment with Plaintiffs.

234.    Fowler received confidential information provided to him by LSC/ROX in the course of his employment.

235.    Upon information and belief, after Fowler ceased employment at Plaintiffs, he provided confidential information he obtained from Plaintiffs to Volant for his personal benefit or for the benefit of Volant.

236.    Upon information and belief, as a direct result of Fowler's conduct contrary to the interests of Plaintiffs, Plaintiffs have lost a competitive advantage to Volant which, unless enjoined by the court, will result in lost business opportunities, customers, fees, and the devaluing of the Plaintiffs.

237.    Upon information and belief, as a direct result of Fowler's wanton and willful breach of his ongoing fiduciary duties to Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to punitive damages.

**WHEREFORE**, Plaintiffs request that this Court order the following relief in favor of the Plaintiffs:

a) That the Defendants be temporarily, preliminarily and permanently enjoined from possessing or using Plaintiffs' trade secrets including, but not limited to, the source code or architecture of the Plaintiffs' clearing system;

b) That pursuant to the Non-Compete and Confidentiality Agreements, Louis and Fowler be enjoined from competing with Plaintiffs for a period of 18 months from the termination of their employment with LSC;

c) That the Court specifically enforce the Non-Compete and Confidentiality Agreements and the LSC Manual, including an award to Plaintiffs of their attorneys' fees;

d) That the Defendants be required to return all software, data, and documents relating to Plaintiffs' confidential information in their possession and certify to the Court that they have permanently deleted or destroyed any and all copies of Plaintiffs' confidential information and property;

e) That the Defendants be ordered to appear for depositions on an expedited basis and to produce the documents and information requested in Plaintiffs' document requests and interrogatories attached to the declaration of Christina S. Dumitrescu, Esq., dated March 7, 2019, in aid of an anticipated preliminary injunction application;

f) That Louis and Fowler immediately produce for inspection to Plaintiffs any personal computers or devices that have ever contained a document or information copied from the Plaintiffs' computer databases or systems;

g) That Louis and Fowler immediately produce for inspection to Plaintiffs any smartphones, cellphones, or other devices that contain any text or other similar messages used to conduct Plaintiffs' business;

h) That Louis and Fowler immediately provide access to Plaintiffs to their cloud storage systems that contain any information about Plaintiffs' business;

i) That Plaintiffs be permitted thereafter to supervise the permanent deletion from any of Defendants' computers, cloud drives, or other locations the wrongfully misappropriated trade secret and proprietary information and that Defendants be ordered to delete or destroy any and all copies of such information permanently;

j) An award of damages for Plaintiffs against Defendants for all damages suffered by LSC/ROX Systems, and for any profits or gains by the Defendants, attributable to infringement of ROX Systems' copyrights, in amounts to be determined at trial;

k) An award of damages for Plaintiffs against Louis and Fowler, in an amount to be determined at trial, to compensate them for all monetary damages arising from their breaches of contract;

l)   An award of exemplary damages for Plaintiffs against Defendants, in an amount to be determined at trial, to compensate them for all monetary damages arising from the Defendants' misappropriation of trade secrets and attorney's fees;

m)  An award of damages for Plaintiffs against all of the Volant Defendants, jointly and severally, in an amount to be determined at trial, to compensate Plaintiffs for all monetary damages arising from Volant's tortious interference with the Former Employees' contractual obligations to Plaintiffs;

n)   An award of compensatory damages for Plaintiffs against Louis, in an amount to be determined at trial, to compensate them for all monetary damages arising from his breaches of fiduciary duty and duty of loyalty; and

o)   An award of compensatory damages for Plaintiffs against Fowler, in an amount to be determined at trial, to compensate them for all monetary damages arising from his breach of the duty of loyalty; and

p)   An award of punitive damages for Plaintiffs against the Defendants in an amount to be determined at trial.

### JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: New York, New York
March 7, 2019

DENTONS US LLP

By: _____
Brian S. Cousin
Mark D. Meredith
Christina S. Dumitrescu
1221 Avenue of the Americas
New York, New York 10025
Tel: (212) 768-6700
Fax: (212) 768-6800

Brian.Cousin@dentons.com
Mark.Meredith@dentons.com
Christina.Dumitrescu@dentons.com
*Attorneys for Plaintiffs*


TANNENBAUM HALPERN
SYRACUSE & HIRSCHTRITT LLP
Paul D. Sarkozi
Carl F. Regelmann
Richard W. Trotter
900 Third Avenue
New York, New York 10022
Tel: (212) 508-6700
Fax: (212) 371-1084
Sarkozi@thsh.com
Regelmann@thsh.com
Trotter@thsh.com
*Attorneys for Plaintiffs*

110344820

51