UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEK SECURITIES CORPORATION and
ROX SYSTEMS, INC.,

         Plaintiffs,

- against –

NICOLAS LOUIS, JONATHAN FOWLER,
VOLANT HOLDING, LLC d/b/a VOLANT
TRADING, VOLANT TRADING, LLC,
VOLANT LIQUIDITY, LLC, AND
VOLANT EXECUTION, LLC.

         Defendants.

Case No.: 19-CV-02142(RMB/BCM)

ECF CASE

---

### DECLARATION OF JONATHAN FOWLER IN OPPOSITION TO PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

I, JONATHAN FOWLER, under penalty of perjury, declare and affirm as follows:

1. I am a former employee of plaintiff Lek Securities Corp. ("Lek"), am currently employed by defendant Volant Execution, LLC (though suspended by Court Order) and am a defendant in the above matter in my individual capacity.

2. I make this declaration based upon personal knowledge, and otherwise on information and belief, to place certain facts before the Court for its consideration.

3. I was hired out of college in October 2011 by Lek Securities to work in back office operations. I was never given an official title, though I would eventually refer to myself as an "Operations Manager."

4. I started in a non-technical role doing mostly daily trade settlement, some client

support, answering phones, and similar tasks. Over the years, I transitioned into a programming role.

5. I designed applications and did maintenance on some of the existing systems. In 2012, Kevin Chin, who ran Lek's options clearing business, left and I was promoted to take over the position.

6. At the time, Lek's options systems were aging, and I assisted in modifying the firm's options clearing technology using then-current technology (which is now seven years old).

7. As with any technology-driven business function, new technologies are constantly coming on the market.

8. Over time, my responsibilities expanded to include creating and supporting technologies and operational duties for risk and margin, securities lending, and trading.

9. By July 2018, when I was terminated, I was an operational and technology generalist, overseeing most of the day-to-day clearing, settlement, and back office functions of the firm.

10. I also functioned as universal understudy, filling in for whomever happened to be out at any particular time in several departments.

11. As a condition of my employment, I was required to execute broad covenants against post-employment competition.

### *March 2017 – SEC Enforcement Action against Lek Leads to Loss of Business and Attrition – I Consider Next Steps*

12. I largely enjoyed my positions at Lek. However, Lek received substantial regulatory scrutiny, and until March 2017, I considered such scrutiny, which largely came from FINRA, a regular part of Lek's business and did not believe such scrutiny had much

impact on the firm's reputation or business.

13. However, in March 2017, the SEC brought a civil enforcement action against the firm and its principal, Samuel Lek. The court denied Lek's motion to dismiss the case, and it is still pending. It was in this environment of uncertainty, and around late 2017 I began to consider new opportunities. I was concerned about my compensation. Eventually, I obtained counsel to advise me on, among other things, the enforceability of their restrictive covenants.

### *June 2018 – I Request Solano's Assistance to Set Up New Remote Workstation*

14. Commencing in June 2017, I worked remotely from my home in St. Louis, MO after relocating due to my wife's participation in a PhD program.

15. In June of 2018, I upgraded my personal computer, and, being proud of my setup, sent Peter Solano a photograph of it by text message.

16. An image of those texts is attached as exhibits to Solano's March 7 Declaration. Lek did not provide me with any computer equipment for my home office, it was all my personal property.

17. The image showed that my computer (which I owned), contained a link to a DropBox account (a file storage application I have used since college), a secure messaging application, and a code-writing application called Visual Studio. While I occasionally wrote code as part of my job, I generally did so via remote desktop directly on my Lek computer via a VPN connection to the New York Office.

18. In Solano's March 7 Declaration, Solano speculated that I could use the various applications to create the *ability* to download code from Lek's source code repository directly to my personal computer and share it over the web.

19. I never connected to Visual Studio Online to download any code from Lek's

repository on any of my personal computers. The only source code repository I recall using at Lek was Visual Source Safe ("VSS"), which, to my knowledge, could only be accessed from my work computer as it was an "on-premises" application. At the time of my resignation, I deleted all Lek data that I was aware of on the devices I used for my home office. After my termination, my counsel disclosed to Lek an accounting of what I had done to safeguard Lek's information and a list of certain older materials that were still in my possession. Lek never asked for anything back, and I subsequently provided all of the Lek-related material I had in my possession to my former lawyer. I am no longer in possession of anything.

### *Late Spring-Summer 2018 –Fowler and I Explore Roles at B. Riley, Obtain Offer and Provide Notice of Resignation to Lek Amid Wave of Attrition*

20. After Lek's negotiations with B. Riley ended, I entered discussions with the company about helping it create in-house capabilities to clear its own trades.

21. I welcomed the opportunity for a change, and to develop an in-house clearing platform from the ground up based on state-of-the-art technologies. The Lek system had been built more than a decade earlier, which meant several generations of technology had come and gone since.

22. On May 25, 2018, B. Riley offered me a position to help it build in-house clearing capabilities from the ground up.

23. I was offered the title of Director of Business Transformation.

24. I accepted the offer and provided Lek with written notice of my resignation on June 11, 2018.

25. In the following month, I worked tirelessly to transition my responsibilities. I spent three weeks away from home in New York in order to help in the process. While

> July 13 was supposed to be my last day based on my notice, I had offered to stay a significant amount of time longer in order to ensure the firm would not struggle unnecessarily due to my absence. Louis and I spent several weeks helping Lek transition responsibilities to other employees, including writing approximately ten manuals to document the processes at the firm.

26. Additionally, I took it upon myself to explain in detail the nature of the work we had been hired at B. Riley to do. I explained to Mr. Lek on multiple occasions the nature and scope of the project. At one point, he told me I had been "exceedingly honest" in the whole matter.

### *Lek Terminates Louis and I Prior to the End of our Respective Notice Periods and then Threatens Litigation; B. Riley Immediately Rescinds our Offer of Employment*

27. On July 13 (a Friday), Lek informed me that I was terminated, effective immediately. The same day I learned that Lek had threatened to sue B. Riley in order to force them to rescind their offer of employment to me, and I received a letter from Lek's counsel threatening an action against me personally.

28. My access to email and the VPN (which was how I was able to connect to my work computer) was disabled in the morning, I understand that this occurred shortly after Louis was terminated.

29. While Lek had initially raised a verbal objection to my and Louis' plans a month earlier, he never issued any ultimatum that he would act unless we changed course. Over the course of the transition, Lek appeared to acquiesce in our decision and appeared to appreciate the long transitions we had agreed to.

30. On Monday, July 16, 2018, B. Riley rescinded its offers of employment and asked us to negotiate a resolution with Lek on our own.

*July-August 2018 – In the Hope of Fostering Peace, Louis and I each Voluntarily Provide Information and Documents to Lek in Order to Demonstrate that (1) No Proprietary Information was Taken and (2) B. Riley would not Compete with Lek or ROX*

31. In the weeks that followed, while we were unemployed, our counsel engaged with counsel of Lek in an effort to convince Lek that (1) neither of us possessed any trade secret information of Lek, and (2) that our helping B. Riley become self-clearing would not compete with Lek's clearing services.

32. My counsel voluntarily provided Lek's counsel access to my emails with B. Riley staff and Mr. Louis, provided information concerning my DropBox account, provided Lek staff with direct access to my personal cloud Azure account, and disclosed that I had possession of a backup hard drive including a handful of programming projects from late 2016 that I had collected in the course of my employment with Lek.

33. Lek's counsel never specified how to return the data. I provided everything I had to my counsel and am no longer in possession of any of Lek's hardware or software. I never accessed, copied, or modified any of these materials in the intervening period after leaving Lek.

34. The contents of my DropBox account, which were disclosed to Lek's counsel, contained largely personal information such as taxes, medical records, records from college and a copy of a ticket to Harry Potter World. I removed all personal programming projects from my computer and DropBox, and put them on a flash drive that was sent to my counsel along with the other Lek material in my possession after we were abruptly terminated.

35. The negotiations were fruitless, and B. Riley's interest in reengagement faded. Lek was simply unwilling to allow us to work anywhere in the clearing industry.

*Louis and Fowler Negotiate Terms of Employment with Volant to help Create new Clearing Capabilities; Agreement Specifically Disclaims Louis and Fowler's Possession of any Code or other Intellectual Property of Lek or ROX*

36. In late 2018, we worked with Volant to craft employment agreements with assurances that neither of us was in possession of Lek's proprietary information, and that neither of us would ever disclose any confidential information. These assurances were and are true.

37. I am the sole earner in my family, supporting my wife who is a PhD candidate. As such, I need to be gainfully employed in order to support my family.

I declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that the foregoing is true and correct.

Executed on: March 13, 2019
New York, New York

*/s/ Jonathan Fowler*
Jonathan Fowler