**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LEK SECURITIES CORPORATION and
ROX SYSTEMS, INC.,

        Plaintiffs,

     - against –

NICOLAS LOUIS, JONATHAN FOWLER,
VOLANT HOLDING, LLC d/b/a VOLANT
TRADING, VOLANT TRADING, LLC,
VOLANT LIQUIDITY, LLC, AND
VOLANT EXECUTION, LLC.

        Defendants.

---

Case No.: 19-CV-02142(RMB/BCM)

## DECLARATION OF NICOLAS LOUIS
## IN OPPOSITION TO PRELIMINARY INJUNCTION AND TEMPORARY
## RESTRAINING ORDER

I, NICOLAS LOUIS, under penalty of perjury, declare and affirm as follows:

1.     I am the former President of plaintiff Lek Securities Corp. ("Lek"), I am currently employed by defendant Volant Execution, LLC (though suspended by Court Order) and a defendant in the above matter in my individual capacity.

2.     I am the primary source of income in my family. My wife teaches Child Welfare at Hunter College, Silberman School of Social Work. We have three young children together.

3.     I hold a Master of Sciences from Ecole National des Ponts et Chaussees, a French engineering school, with a major in Finance.

4.     I make this declaration based upon personal knowledge, and otherwise on

information and belief, to place certain facts before the Court for its consideration.

5.      Lek Securities is a small broker-dealer that provides its customers with ability to route orders to the various U.S. exchanges for execution. Lek Securities is also an agent broker-dealer providing clearing and safekeeping services across a broad range of asset classes. Lek Securities does not engage in any proprietary trading.

6.      Lek is a member of the Depository Trust and Clearing Corp. ("DTCC"), the National Securities Clearing Corporation ("NSCC") and the Option Clearing Corporation ("OCC").

7.      These clearing agencies offer extensive documentation on clearing. For example, DTCC has a dedicated website www.dtcclearning.com available for its participants.

8.      The DTCC's website provides a number of materials for participants in the clearing market.  Their website explains: "DTCC Learning offers a growing library of more than 4,500 learning assets, which are available to all DTCC clients at no charge. Customized learning programs can be tailored specifically to client's requests for a fee upon request. The information is presented largely so clients can learn at their own pace, including new user toolkits; step-by-step "how to's"; industry and product webinars led by experts; detailed product documentation; and simulations that walk users through highly complex transactions to completion. http://www.dtcc.com/dtcc-connection/articles/2019/february/27/dtcc-learning-helping-clients-optimize-dtcc-services-every-day.

9.      These clearing Agencies have an interest in educating their members and potential new members. As "systemically important financial markets utilities"(SIFMU), they are required to monitor and manage the risk of the system. More institutions able to clear means less risk for the system.

### *Fowler and I are Hired by Plaintiffs with Broad Restrictive Covenants as Mandatory Conditions to Employment*

10.   I started to work for Lek Securities in April 2004 as a Vice President of Operations. I grew with the firm and learned about the business of trade execution and clearing, among other things.

11.   As a condition of my employment, I was required to execute broad covenants against post-employment competition.

12.   In 2012, Samuel Lek promoted me to the position of President of Lek Securities. I was to oversee the day-to-day operations while Samuel Lek was in charge of compliance and interactions with the regulators.

13.   During that time, I became a Jack-of-all-Trades at Lek. My day-to-day responsibilities included, among other things, trade clearance, trade settlement, trade support, risk and financial operations, development of new technology, interacting with customers.

14.   Over the years, I developed a close personal relationship with the company's Chief Executive Officer (and main owner), Samuel Lek. He came to my wedding in Paris in 2009, we shared taxis home most nights after work, I often spent weekends with my family at his home in the Hamptons. We became very close friends.

### *March 2017 – SEC Enforcement Action against Lek Leads to Loss of Business and Attrition – I Consider Next Steps*

15.   Lek received substantial regulatory scrutiny, but until March 2017, I considered such scrutiny, which largely came from FINRA, a regular part of Lek's business, and did not believe such scrutiny had any impact on the firm's reputation or business.

16.   On March 10, 2017, the Securities and Exchange Commission commenced a civil enforcement action alleging that Lek Securities and Samuel Lek aided and abetted

manipulative trading schemes by one of Lek Securities' customers, Ukraine-based

trading firm Avalon FA Ltd, Avalon's owner Nathan Fayyer, and its alleged

undisclosed control person, Sergey Pustelnik.

17. Lek denied the allegations, and has been vigorously defending the case.   However,

in the year that followed the SEC complaint, Lek's business has suffered to an

extent.  A few counterparties stopped doing business with Lek, some customers left.

It became very difficult to bring new accounts. My day to day job became mostly

about dealing with lawyers and regulators. I strongly believed the firm was

struggling and that it would get worse over time.

18. It was in this environment of uncertainty that I began to consider new opportunities

around late 2017.  Eventually, I obtained counsel to advise me on, among other

things, the enforceability of my restrictive covenants.

### *Spring 2018 – Louis Works with Peter Solano to Test Microsoft's Azure Cloud-Based Product*

19. Around April 2018, I became interested in whether in the capabilities of a new

cloud-based Microsoft product, Azure, could be leveraged for Lek.  Lek's operations

were/are heavily reliant on old databases, and I thought it possible that Lek could

use Azure to efficiently update, expand and improve its database-driven capabilities.

20. Around April 2018, I set up a basic Azure account, using my Lek-issued email,

nicolas@leksecurities.com, as credentials.  Because the credentials were based on

my Lek-issued email, Lek controlled the Azure account, not me.  The basic trial

allowed me to spend $200 in free Microsoft credit. I notified Peter Solano, the Chief

Information Security Officer immediately. We agreed that I would test this Azure

account until he was able to establish a new subscription under ROX Systems. The

$200 free credit were exhausted very quickly from my playing around with the

product to see how it worked.

21.     In order to open a new subscription with Azure, a Credit Card is required. Lek
        Securities Credit card was used to open the nicolas@leksecurities.com subscription.
        The subscription was however never converted into a "pay-as-you-go" subscription
        and no fee were ever incurred as a result of this account. That account expired in
        May 2018.

22.     In May 2018, Pete Solano created a ROX Systems MSDN Azure account and shared
        access with me again under nicolas@leksecurities.com.

23.     Around the same time, Pete Solano shared with me that he was working on a side
        business and that he could use some help on the technology. His business was a
        subscription service that allows users to use past performance data to predict the
        outcome of upcoming horse races. I offered to help immediately and explained that
        it would be a great pet project for me to learn about the Azure technology. His
        business is called 2Minutes2Post.

24.     On May 18, 2018, Pete Solano shared the Azure account of his side business
        "2minutes2Post" with me under coachnico00@gmail.com. Most of the time I spent
        playing with Azure was related to Pete Solano's project: migrating the horse-racing
        business data to Azure.

25.     It is unclear which Azure accounts are referred to in the March 7, 2019 Declaration
        of Peter Solano.  However, I never moved any data obtained from Lek or any of
        Lek's confidential information into any account not controlled by Lek.

**B. Riley's Business**

26.     In the late spring of 2018, Fowler and I entered discussions to take new positions at
        B. Riley Corp. ("B. Riley").   B. Riley is an investment bank that owned and

operated a substantial broker-dealer business, but did not have the capability to clear trades.   B. Riley relied on third-party clearing agents, and spent millions of dollars each year for their services.   For a time, B. Riley engaged in discussions with Lek regarding a potential acquisition of Lek, but Lek had no interest in the deal being discussed.

***Late Spring-Summer 2018 – Fowler and I Explore Roles at B. Riley, Obtain Offer and Provide Notice of Resignation to Lek Amid Wave of Attrition***

27.   After Lek's negotiations with B. Riley ended, I entered discussions with B. Riley about helping it create in-house capabilities to clear its own trades.

28.   I provided B. Riley with estimates of the cost and the likely timetable for such a project.  I gave the B. Riley proposal the tongue-in-cheek name "Operation Secret Octopus."

29.   "Operation Secret Octopus" is a 4-page Memorandum including generalities about clearing, background information about Fowler and I, and a rough timeline for the project implementation. The project did not involve stealing anything.  It was a short proposal of how Fowler and I could go about building in-house clearing capabilities for B. Riley from scratch based on new technologies.

30.   I welcomed the opportunity for a change, and to develop an in-house clearing platform from the ground up based on current technologies.   The Lek system had been built more than a decade earlier, which meant several generations of technology had come and gone since.

31.   On May 25, 2018, B. Riley offered me a position to help it build in-house clearing capabilities from the ground up.

32.   I was offered the title of Managing Director of Business Transformation.

33.   I accepted the offer and provided Lek with written notice of my resignation on June

11, 2018.

34. In the following month, I worked tirelessly to transition my responsibilities.   While July 13 was supposed to be my last day based on my notice, I had agreed with Samuel Lek to continue working to complete the transition.  Fowler and I spent several weeks helping Lek transition responsibilities to other employees, including writing over ten manuals to help with the transition, and interviewed potential candidates.

35. On July 13, 2018, I returned a Lek-issued laptop computer.

36. I had barely used the laptop for work, but rather for personal uses at home.   As a result, prior to returning the laptop, I copied certain personal files from it, and then deleted all of the stored files before returning it.

37. I explained that I had done this to Peter Solano when returning the laptop.

38. The documents did not include any Lek code, algorithms or proprietary information. Rather, they included:

 a. school financial aid forms;

 b. emails relating to my resignation;

 c. Lek expense reimbursement forms;

 d. documents relating to my children;

 e. movies that my children watched;

 f. music sheet;

 g. a home video of me playing the piano with my children;

 h. a copy of my resume and cover letter;

 i. documents relating to my planned employment with B. Riley;

 j. W2s and tax returns from 2016 and 2017; and

k.   documents relating to my wife's US visa.

39.   On July 19, 2018, that information was provided by my counsel to Lek's counsel, with a full copy of everything that was downloaded from the laptop.

40.   On May 17, 2018, the Chief Executive Officer of ROX Systems, who had been working with Samuel Lek for more than 15 years, resigned. She gave 3-weeks notice. Her last day was June 6, 2018.

41.   On May 23, 2018, a junior developer working for ROX Systems resigned. She gave 1.5-week notice. Her last day was June 1, 2018

42.   On June 22, 2018, a group of about 15 Lek Securities representatives, working from the New Jersey office for about 1 year, resigned, with no notice.

43.   During the summer 2018, the Chief Financial Officer of Lek Securities resigned.  He had been with Lek Securities since July 1998.

***Lek Terminates Fowler and Me Prior to the End of our Respective Notice Periods and then Threatens Litigation; B. Riley Immediately Rescinds our Offer of Employment***

44.   On July 13, 2018 (a Friday), after turning in my computer, Samuel Lek invited me for a coffee outside the office. As soon as we walked outside of the building, Samuel Lek informed me that I was terminated, effective immediately.  The same day I learned that Lek had threatened to sue B. Riley in order to force them to rescind their offer of employment to me, and I received a letter from Lek's counsel threatening an action against me personally.

45.   While Lek had initially raised a verbal objection to my and Fowler's plans a month earlier, he never thereafter issued any ultimatum that he would act unless we changed course. To the contrary, over the course of the transition, Lek appeared to acquiesce in our decision and appeared to appreciate the long transitions we had agreed to.

46.     On Monday, July 16, 2018, B. Riley rescinded its offers of employment and asked

us to negotiate a resolution with Lek on our own.

***July-August 2018 – In the Hope of Fostering Peace, Fowler and I Voluntarily Provide Information and Documents to Lek in Order to Demonstrate that (1) No Proprietary Information was Taken and (2) B. Riley would not Compete with Lek or ROX***

47.     In the weeks that followed, while we were unemployed, our counsels engaged with

counsel to Lek in an effort to convince Lek that (1) neither of us possessed any trade

secret information of Lek, and (2) that our helping B. Riley to become self-clearing

would not compete with Lek's clearing services.

48.     My counsel disclosed that I had retained a USB stick containing the 10 categories of

documents listed above, and gave Lek's counsel access to all communications

between me and B. Riley.  In fact, I paid to hire V-Discovery to perform the email

extraction in order to show that I was completely honest with Lek.

***September-October 2018 – In Purported Settlement Discussions, Lek Demands that Fowler and I increase our Periods of Restriction from 18 to 36 months, Agree not to Work Together or for any Company that Provides Clearing Services***

49.     The negotiations were fruitless, and B. Riley's interest in reengagement faded.   Lek

was simply unwilling to allow us to work in our field of expertise, anywhere.

Though Lek did suggest I return to Lek.

50.     In September 2018, when I demanded that Lek articulate reasonable terms so that all

parties could move on with their lives, Lek's "offer" was that neither Fowler nor I

compete (in the broadest sense of the terms) for now 24 months, a 6-month increase

from our original non-compete agreements, *plus* we agree not to take any position at

B. Riley for 24 months, *plus* we agree not to work together at the same company for

24 months.

51.     By October 2018, Lek's counsel would "not consider any proposed settlement

agreement in which: a) either Louis or Fowler work for B. Riley within the next 3 years, b) Louis and Fowler are permitted to work for the same employer during the next 3 years, or c) the non-compete provision is reduced below 18 months from the date of termination"

52.     Around this time, we first met with executives at Volant. Volant expressed interest in our potential employment with Volant, as part of Volant's new and developing partnership with a Chinese fintech firm.

***Volant's Business***

53.     Volant is a technology-driven proprietary trading firm comprised of quantitative traders and technologists who work together as a single team. This stands in contrast to Lek, which does not engage in proprietary trading.

54.      Volant acquired Compass Professional Services at the end of 2017 and through that acquisition became a limited member of OCC. While Volant has limited option-clearing capabilities, due to the substantial regulatory and operational requirements, it would take Volant at least 18 months to develop the ability to offer clearing services to potential customers, which would be 24 months or more after my employment with Lek terminated.

***Louis and Fowler Negotiate Terms of Employment with Volant to help Create new Clearing Capabilities; Agreement Specifically Disclaims Louis and Fowler's Possession of any Code or other Intellectual Property of Lek or ROX***

55.     In late 2018, we worked with Volant to craft employment agreements with assurances that neither of us was in possession of Lek's proprietary information, and that neither of us would ever disclose any confidential information.   The assurances we gave Volant are true.

56.     On February 6, 2019, nearly seven months after Lek's aggressive tactics caused B.

Riley to rescind their offer, rendering me unemployed, I finally went back to work.

57.     I am the primary breadwinner in my family, as such, a return to gainful employment
was especially welcome.

58.     To date, Lek has failed to pay me approximately $150,000 that I am owed to buy out
my minority (~1%) interest in Lek Securities.   During the second half of 2018, my
counsel also inquired, multiple times, about the money owed to me for being a
minority shareholder of Lek Securities Holding. Over the time working at Lek
Securities, I was given the opportunity to invest in the company which I did. I
acquired up to 9 shares valued at about $150,000 by the time I was terminated.

I declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that the foregoing is true and
correct.

Executed on:   March 13, 2019
               New York, New York

Nicolas Louis