J385lekC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

LEK SECURITIES CORPORATION,
and ROX SYSTEMS, INC.,,

                  Plaintiffs,                    New York, N.Y.

           v.                              19 CIV. 2142 (LTS)(RMB)

NICOLAS LOUIS,
JONATHAN FOWLER,
VOLANT HOLDING, LLC,
VOLANT TRADING, LLC,
VOLANT LIQUIDITY, LLC,
VOLANT EXECUTION, LLC,

                Defendants.

-------------------------------x

                               March 8, 2019
                               2:30 p.m.

Before:

                  HON. RICHARD M. BERMAN,

                               District Judge

J385lekC

1                            APPEARANCES

2  TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT, LLP
        Attorneys for Plaintiffs
3  BY:  CARL F. REGELMANN
        PAUL D. SARKOZI
4            -and-
   DENTONS US LLP (NY)
5  BY:  BRIAN S. COUSIN
   BY:   MARK MEREDITH
6
   SCHULTE, ROTH & ZABEL, LLP
7        Attorneys for Volant Defendants
   BY:  MAX GARFIELD
8  BY:   HOWARD SCHIFFMAN
             -and-
9  STROOCK & STROOCK & LAVAN, LLP
   BY:  IAN G. DiBERNARDO
10
   NICOLAS LOUIS, Pro se
11

12  ALSO PRESENT:  Michael Sanocki, Volant in-house counsel

13

14

15

16

17

18

19

20

21

22

23

24

25

J385lekC

```
 1          (Case called)

 2          THE COURT:  In addition to the lawyers, let me

 3   understand who is here.  Are any of the principals here, for

 4   example the two employees in question?  Are they here?

 5          MR. SCHIFFMAN:  One of the two employees.

 6          Your Honor, Howard Schiffman.  I am here on behalf of

 7   the corporate defendants.  Seated behind me on the far right,

 8   your far right is Michael Sanocki, he is general counsel of the

 9   corporate defendants, right there.

10          THE COURT:  Yes.

11          MR. SCHIFFMAN:  Seated in the middle is Nicholas

12   Louis, he is one of the named defendants, and to his left --

13          THE COURT:  Is he represented?

14          MR. SCHIFFMAN:  He is not, your Honor.

15          THE COURT:  Okay.

16          MR. SCHIFFMAN:  He didn't do -- he was only notified

17   last night and didn't have an opportunity to get a lawyer.

18          THE COURT:  Is he intending to?

19          MR. SCHIFFMAN:  Yes.  I assume so.

20          Mr. Louis?

21          THE COURT:  Are you planing to get a lawyer?

22          DEFENDANT LOUIS:  Yes.  I'm going to need some time.

23          MR. SCHIFFMAN:  And then the other defendant,

24   Mr. Fowler, is in St. Louis, he was not physically able to get

25   here in time, and he does not have a lawyer as well, your
```

J385lekC

1      Honor.

2              And then the last gentleman sitting in the back bench

3      there is Anthony Lowe, who is a colleague of mine from Schulte.

4              THE COURT:  Okay.  So, I have had a preliminary look

5      at the submissions, not an entirely thorough one, but enough to

6      know pretty much what is going on and I have these questions,

7      preliminarily.

8              One is there seems to be some suggestion here about,

9      Mr. Schiffman, whether you can represent both the client that

10     you are representing today having represented the plaintiff

11     corporation before.

12              Is that accurate?

13              MR. SCHIFFMAN:  I guess that's for the plaintiffs to

14     decide, your Honor.  I represented the plaintiffs prior to

15     March 3rd, 2014.  I represented them in three enforcement

16     action where they were accused of market manipulation --

17              THE COURT:  Well, you know, I don't need to know the

18     details.  You are an experienced lawyer and they're experienced

19     lawyers.  Is there a problem or isn't there a problem?

20              MR. SCHIFFMAN:  I believe there is zero.  I told them

21     that yesterday.

22              THE COURT:  Why is that?

23              MR. SCHIFFMAN:  Because the matters I related to have

24     nothing do with, anything to do with clearing, and the code,

25     and the issues in this case.  I represented them five years ago

J385lekC

1    in an enforcement matter before the Exchanges relating to

2    market manipulation.  It has nothing to do -- I wouldn't know a

3    line of code if it bit me.

4         THE COURT:  Well, in the old days, if you will forgive

5    me, I go back to the old days, there was always an issue when

6    someone who represented just the same client showed up, you

7    know, even it's not on exactly this case.  So, you see no --

8         MR. SCHIFFMAN:  Zero, your Honor.  I spoke to the

9    general counsel of Schulte and we have no issue whatsoever.

10        THE COURT:  Right.

11        MR. SCHIFFMAN:  It is not related in any way.

12        THE COURT:  What do the plaintiffs think?

13        MR. SARKOZI:  It is unclear to us that that's the

14    case.

15        THE COURT:  That what's the case?

16        MR. SARKOZI:  That there is no conflict of interest.

17             In our view, based on the understanding that we have,

18    the prior matters which involved, in part, Mr. Louis and

19    Mr. Schiffman's involvement with working with Mr. Louis as a

20    witness, did in fact involve some aspects related to clearing.

21        THE COURT:  So, how would you suggest that I figure

22    this out?  How would you figure this out?  When will you know

23    and whether you need to know in order to reach a conclusion?

24        MR. SARKOZI:  I think we need to engage further in

25    conversations with Mr. Schiffman to understand a little bit

J385lekC

1    better and also to understand the degree to which Mr. Schiffman

2    would intend to be using any of the issues that involved in the

3    prior litigation.

4            THE COURT:  Okay.  All right.

5            MR. SARKOZI:  In this matter, I would note that

6    Mr. Schiffman did reach out to another counsel for Lek

7    Securities Corporation the past couple of weeks.  That counsel

8    is involved currently in litigation in which Mr. Louis is a

9    potential witness and it derives directly from Mr. Schiffman's

10   prior representation of Lek Securities.  We do need to sort

11   that issue out for purposes of today, however we do want to

12   proceed today because we are interested in getting the

13   temporary restraining order for our application.

14           THE COURT:  I got it.

15           MR. SARKOZI:  So, we would like to reserve the

16   right --

17           THE COURT:  Yes.

18           MR. SARKOZI:  -- to brief that issue.

19           MR. COUSIN:  Your Honor, one other point?  This is

20   Mr. Cousin.

21           Mr. Schiffman, yesterday, told us on the phone that

22   everything regarding his involvement in the prior actions was,

23   quote, public record, and that he would send us transcripts

24   that would reveal the information regarding that.  We have not

25   received them yet --

J385lekC

1          THE COURT:  Okay.

2          MR. COUSIN:  -- even though we were supposed to get

3     them.

4          MR. SCHIFFMAN:  That's not true.  Let's just stop.

5          THE COURT:  No.  No.  No.

6          Just relax.  This is a relaxed courtroom but a serious

7     courtroom.  One person talks at a time, not two.  Don't need

8     two people standing, actually.  And, we are just going to move

9     steadily but without any kind of acerbic.  I don't know if

10    that's the word.  What about these two individuals defendants.

11    What is their exact employment status today?

12         MR. SCHIFFMAN:  The two.

13         THE COURT:  Name, first.

14         MR. SCHIFFMAN:  Mr. Nicolas Louis and Jonathan Fowler

15    are and have been employes of Volant Execution, LLC, and also

16    of Volant Holdings, LLC.

17         THE COURT:  You mean they are employees or they get a

18    paycheck?

19         MR. SCHIFFMAN:  Yes.  They're working, your Honor.

20         THE COURT:  As what?

21         MR. SCHIFFMAN:  They are working, Mr. Louis' title is

22    Director of Clearing, as I think in the documents we gave, your

23    Honor, we told them in January that we were going to hire them

24    and, in fact, my partner sent them a letter on February 5

25    informing that he was going to start work on February 6.

J385lekC

1          THE COURT:  So he is on -- you are on the payroll as

2     director of clearing?

3          DEFENDANT LOUIS:  Yes.

4          THE COURT:  What about Mr. Fowler?

5          MR. SCHIFFMAN:  He is an operations manager.

6          THE COURT:  He is on payroll, too?

7          MR. SCHIFFMAN:  He is on payroll as of February 6 as

8     well, your Honor.

9          THE COURT:  When did you all tell the plaintiffs they

10    were coming on board as employees?

11         MR. SCHIFFMAN:  We first told them, I believe, in

12    mid-January of this year, your Honor.  I had conversations with

13    counsel in which we tried to work out the terms in which they

14    would become employees and then we sent them a writing which is

15    attached to the affidavit.  The affidavit Exhibit F, we sent

16    them written notice of the fact on February 5, 2019, and in

17    Exhibit G Mr. Regelmann responded that he understood they were

18    responding on February 6.

19         THE COURT:  I got it.  And so, the next question I

20    have is you suggested it by your answer to this last question,

21    is there a way that you two sides can work out this matter

22    without the need for my intervention?

23         MR. SCHIFFMAN:  Your Honor, I spoke to counsel for --

24    and again, I would say the answer is no.  We tried to -- it is

25    our position, as you will hear when we get our chance, that

J385lekC

these fellows no longer have any information, we have put in

procedures to make sure they don't have any information.  We

asked counsel if they had any --

       THE COURT:  What do you mean they no longer have

information?

       MR. SCHIFFMAN:  In other words there is, as you read

in the complaint, a whole series about what they did with

B. Riley, and what we will show you is that when Lek found out

about the B. Riley situation, Mr. Louis and Mr. Fowler made all

of their files available to Lek.  Lek went through their

e-mails, their DropBox, their hard drives, and retrieved that

information which they thought was appropriate or

inappropriate.

       THE COURT:  Right.

       MR. SCHIFFMAN:  At this time we have representations

by counsel for Mr. Louis and for Mr. Fowler that they no

longer --

       THE COURT:  I thought they didn't have counsel.

       MR. SCHIFFMAN:  They had counsel at the time of the

B. Riley situation.

       THE COURT:  When was that?

       MR. SCHIFFMAN:  Eight months ago.

       THE COURT:  All right.

       MR. SCHIFFMAN:  We have representations which I will

show you --

J385lekC

1          THE COURT:  That's another prospective employer?

2          MR. SCHIFFMAN:  Another prospective employer.

3          And we gave you some of this information in Exhibits C

4   and D, we have both for the letter of offer letter and the

5   employment agreement.  I have another document that we got

6   representations before we employed them that they had no

7   confidential information and they assured, and they have a

8   written agreement, that they will not use any confidential

9   information.

10          We asked Mr. Lek's attorneys whether there were any

11  other procedures they wanted to put into place to try to make

12  sure to confirm that.  We asked them was there some dollar

13  amount of money that we could pay so that we could just not

14  fight about it although we thought there was nothing

15  inappropriate.  That was not successful and I suspect the

16  reason we are here is that that was not successful.

17          THE COURT:  Okay.

18          So, we will start, we are not going to make a big

19  to-do about this but let's hear briefly what you are after.  By

20  start I mean state your name and who you represent.

21          MR. SARKOZI:  Sure.

22          I am Paul Sarkozi.  With me is my colleague --

23          THE COURT:  Would you spell your name for the record?

24          MR. SARKOZI:  I will.  S like Sam, A-R-K-O, Z like

25  zebra, I.  And with me is my colleague Carl Regelmann,

J385lekC

1   R-E-G-E-L-M-A-N-N.  We are at Tannenbaum Helpern and we

2   represent the plaintiffs here, as do Brian Cousin, C-O-U-S-I-N,

3   and Mark Meredith of the firm Dentons U.S. LLP.

4           THE COURT:  Okay.  Got it.

5           MR. SARKOZI:  We are here, your Honor, to seek a

6   temporary restraining order and expedited discovery.

7           Frankly, even what I am hearing right now beyond the

8   fact that it discusses settlement communications specifically

9   which we have been careful to avoid --

10          THE COURT:  Careful to avoid settlement?

11          MR. SARKOZI:  No, we are not careful to avoid

12  settlement.  We had discussions about this.  Frankly --

13          THE COURT:  A lot of lawyers that come in here are --

14          MR. SARKOZI:  I understand.

15          THE COURT:  Go ahead.

16          MR. SARKOZI:  The difficulty that we have here is,

17  one, we do not trust the representations that have been given,

18  including the representations about destruction based on --

19          THE COURT:  Given by whom?

20          MR. SARKOZI:  That we have just heard right now.

21          THE COURT:  You have to be more specific.

22          MR. SARKOZI:  By counsel for Volant.

23          THE COURT:  You don't trust counsel's representation

24  or some other representation?

25          MR. SARKOZI:  I don't distrust counsel's belief as to

J385lekC

1      the representations that he has made.  However, we have

2      received materials and the materials that we received from

3      B. Riley --

4              THE COURT:  That is this eight month ago other

5      situation?

6              MR. SARKOZI:  Correct.

7              THE COURT:  Why don't you, for the record, just

8      explain what happened there.

9              MR. SARKOZI:  Sure.

10             In our view, this is the second go round of the same

11     activity.

12             What happened was B. Riley was engaged in

13     conversations with Lek and Rox by potentially licensing or

14     acquiring Rox technology.  That meeting had been set up by

15     Jonathan Fowler, one of the defendants here.  Those discussions

16     broke down, but what we subsequently learned in documents

17     produced to us by B. Riley was that when, in connection with

18     those discussions breaking down --

19             THE COURT:  Yes.

20             MR. SARKOZI:  -- defendants Fowler and Louis,

21     describing themselves as the dream team, put together a

22     business plan that they called operation "Secret Octopus."

23     This business plan was a plan to essentially take the clearing

24     operations that Lek and Rox had developed, the core to their

25     business success in market advantage.  What Lek and Rox have

J385lekC

1    done, over the course of 25 years and $50 million, is be able

2    to put together stock and option clearing capacity that most

3    broker-dealers, except the very largest, have to pay

4    third-party providers to provide --

5              THE COURT:  Okay.

6              MR. SARKOZI:  -- at millions of dollars.  They put

7    this together through, in a very inexpensive way using a

8    network of personal computers but it is not just the way that

9    they did it --

10             THE COURT:  This is a product of your clients?

11             MR. SARKOZI:  This is a product of my clients.  It is

12   not just the network of the personal computers, it is in

13   addition to that.  As opposed to the giant mainframe, very

14   expensive super computers that the large clearing companies

15   use, what they have done is, in addition, they have developed

16   200 different applications, software applications that

17   seamlessly integrate and pull on dozens of databases that

18   contain customer information and trading information over an

19   extended period of time, figure out which of that

20   information --

21             THE COURT:  I got it.

22             MR. SARKOZI:  Needs to be brought to bear --

23             THE COURT:  I got it.

24             MR. SARKOZI:  Yes.

25             THE COURT:  In what role did the individual defendants

J385lekC

1    play in the development of that product.

2              MR. SARKOZI:  I think the answer best comes out of the

3    defendants' mouth.  Two of the individual defendants said, and

4    if you look at the Exhibit 5 at B. Riley, page 12, and this is

5    Exhibit 5 to the Samuel Lek declaration, their language is, *We*

6    *are the clearing part of Lek.*

7              THE COURT:  I haven't read everything but I did read

8    that.

9              MR. SARKOZI:  And they say it for good reason.

10   Mr. Louis was the president of Lek, and he was the president of

11   Lek and in that position and working for Lek for 13 years and

12   his responsibilities were to develop and improve upon many of

13   these applications that are proprietary and that are critical.

14   Mr. Fowler was brought on and worked there for six years, and

15   day-to-day his exclusive role was to be involved in the

16   development of code, software, applications, processes.  There

17   was a reason why they said we are the clearing part of Lek and

18   the reason why, they also say, that they were going to be in a

19   position to put Lek out of business and the reason for that is

20   if you take and give to someone else the product of $50 million

21   and 25 years of work and let them recreate it in less than a

22   year, for very minimal expense you create a super-competitor

23   who doesn't have the investment and can compete and use your

24   trade secrets against you.

25             THE COURT:  I got it.

J385lekC

1             MR. SARKOZI:  And another critical piece --

2             THE COURT:  Yes.  So, I get it.  I get it.

3             So, can they not work, ever, for anybody except your

4     clients?

5             MR. SARKOZI:  No.  That's absolutely not the case.

6     But there is one piece --

7             THE COURT:  What could they do?

8             MR. SARKOZI:  So, the restrictive covenants limit them

9     for working in businesses that are in the business of creating

10    software for trading of securities.

11            THE COURT:  Ever?

12            MR. SARKOZI:  So it's an 18-month restrictive

13    covenant, it is limited in scope, particularly to their jobs.

14    They are Series 7, Series 24, they are very well licensed and

15    experienced people in the brokerage industry who could do a

16    range of things in the brokerage industry having nothing to do

17    with this type of activity.  They could go completely outside

18    the brokerage industry as well.  They're sophisticated

19    programmers, there is a lot of need for programmers in this

20    stem society but, very significantly, when Louis and Fowler

21    each came to Lek, they had no experience with clearing.  They

22    learned about clearing from Lek.  They learned it only through

23    Lek's systems and how Lek's proprietary systems operate.  It's

24    like the old joke about one fish turning to the other and one

25    fish says, *How's the water?*  And the second fish says, *What*

J385lekC

1    *water?*  All they know about clearing is what they do and what

2    that means is if they go, for example, to become director of

3    clearing at Volant, it is even if they have the no intention,

4    as they purportedly claim, to use the technology, and I don't

5    think the record bears that out at all given the steps that

6    they took in connection with operation Secret Octopus.  But

7    Judge Jones, Judge Karas, Judge Newman before going to the

8    Second Circuit all talked about in connection with restrictive

9    covenants like we have here where there is a protectable

10   interest in not having an employee, a high-level employee like

11   these individuals using or disclosing trade secrets or

12   confidential information or confidential processes --

13            THE COURT:  I get that.

14            MR. SARKOZI:  It is inevitable, it would be almost

15   impossible for them not to use it because, as they're

16   developing something that will be in their mind saying, well,

17   how does this compare to what we did at Lek?  And the Courts

18   have said consistently in the cases that we cite on page 41 of

19   our papers, that risk of inevitable disclosure is real, it

20   causes irreparable harm or irreparable injury, and it provides

21   a solid basis for the enforcement of a restrictive covenant.

22            THE COURT:  I get that.  What's the cure for that?

23   Can they work for defendants at all?

24            MR. SARKOZI:  They cannot work for Volant.  They can

25   worth for other -- they can't, because they're in the -- Volant

J385lekC

1    is a business that is primarily involved in trading operations

2    and they're being brought in for software purposes.  If there

3    was some potential discussion about working for Volant having

4    nothing to do with back office operations and trading, I don't

5    think it's part of Volant's business but I would have to have a

6    discussion on that to see.

7              THE COURT:  I got it.

8              MR. SARKOZI:  But there are countless other firms and

9    opportunities they could work at without having any risk

10   whatsoever of disclosing these trade secrets.

11             THE COURT:  So, they're already working there?

12             MR. SARKOZI:  They have begun working there.  We have

13   now confirmed yesterday, because nothing appeared on the FINRA

14   broker check website, nothing appeared on Mr. Fowler's LinkedIn

15   page about taking on some new job, and there was that

16   conversation from Mr. Schiffman as we were engaged in

17   negotiations, which is what we were, where Mr. Schiffman

18   reached out to another counsel for Lek.  It wasn't until

19   yesterday that we were able to confirm that they're working

20   there and it's not just bluffing.  And the reason I say not

21   just bluffing is because Mr. Schiffman had represented Mr. Lek

22   on many occasions and Mr. Lek was familiar with his style, and

23   yesterday it became real and yesterday we called everybody and

24   today we are here.

25             And, the idea that -- I understand that Mr. Louis is

J385lekC

1   here without counsel by choice and Mr. Fowler is not here, we

2   immediately reached out yesterday morning to the counsel for

3   Mr. Fowler that we had been dealing with in the wake of Riley

4   and the counsel for Mr. Louis.  It is clear, if you look at

5   exhibits --

6           THE COURT:  Did you reach them?

7           MR. SARKOZI:  We left them messages and we sent them

8   later in the day a letter when we didn't hear back from them

9   and we also, when we sent the letters yesterday, we sent it to

10  Mr. Fowler and Mr. Louis just in case, to make sure that they

11  are aware.  A critical thing is --

12          THE COURT:  No, no, no.

13          So, you don't know if they're represented now or if

14  those people are planning to represent them again?  At the

15  moment they say -- well, one of them is not here and the other

16  one says he is thinking about a lawyer.

17          MR. SARKOZI:  Right.  To my knowledge, I don't know

18  whether they're represented except that Mr. Louis' prior

19  counsel reached out to us last night and advised us that he was

20  no longer representing Mr. Louis but the critical point is this

21  is no surprise.  Not only do they have our letter warning of

22  potential litigation but, back in January, before they even

23  reached out to us when they wound up getting employment

24  agreements, if you look at Exhibits D and E of Mr. Garfield's

25  declaration, what you will see is there is an Addendum II in

J385lekC

1    the back, and the Addendum II contemplates litigation that Lek
2    might bring.
3            They knew this was coming.  In fact, I would submit
4    that Exhibits D and E, to the extent that they forswear any
5    desire whatsoever --
6            THE COURT:  Yes.
7            MR. SARKOZI:  -- to be using our trade secrets, are
8    documents that they knew would be -- maybe not D and E, maybe
9    Exhibit A and B, for this day, which they knew was coming.  For
10   them not to have counsel at this point is a choice that they
11   made.
12           THE COURT:  Well, yes.
13           So, I am just looking at your proposed temporary
14   restraining order.  So, they have to be fired, under your
15   temporary restraining order?  Or go on vacation?  What do they
16   have to do?  I mean, you have a paragraph D, as in David, that
17   says -- let's see what it says -- enjoining during the pendency
18   of this action, the defendants Nicolas Louis and Jonathan
19   Fowler, from working for defendants --
20           MR. SARKOZI:  Yes, your Honor.
21           THE COURT:  -- or with any agents or employees of
22   defendants, etc., etc.
23           What in the real world are you saying has to happen?
24           MR. SARKOZI:  We are in federal court.  We are in
25   federal court where motions for preliminary injunction have to

J385lekC

|  1 | be heard in a quick time.  We have asked for expedited
|  2 | discovery.
|  3 |         THE COURT:  This is pretty quick.  You have gotten
|  4 | today, right?
|  5 |         MR. SARKOZI:  We got it today.  Thank you, your Honor.
|  6 |         THE COURT:  So far we are living up to our reputation.
|  7 |         MR. SARKOZI:  Absolutely.  Our feeling is during this
|  8 | period of time they should be suspended and not do any work
|  9 | there.
| 10 |         And, frankly, this is no surprise.  They knew the
| 11 | litigation was coming, their own employments agreements say it.
| 12 |         THE COURT:  Okay.  I got it.
| 13 |         So, just so you know, I'm going to go back to that
| 14 | counsel issue and I'm not suggesting that you have a conflict
| 15 | but that has to be resolved --
| 16 |         MR. SCHIFFMAN:  Sure.
| 17 |         THE COURT:  -- over this weekend between you and your
| 18 | colleagues here as to whether they think there is or there
| 19 | isn't.  I am sure if there isn't they'll be reasonable, but if
| 20 | they think there is --
| 21 |         MR. SCHIFFMAN:  Again, your Honor, they know and what
| 22 | I told counsel yesterday, I tried a case against the New York
| 23 | Stock Exchange.  They have the transcripts.  The trial is
| 24 | there.
| 25 |         THE COURT:  I'm not looking for the proof right now.

J385lekC

| | |
|---|---|
| 1 | MR. SCHIFFMAN:  Their client has the complaints that |
| 2 | were filed by the various government agencies that he tried |
| 3 | five or six years ago. |
| 4 | THE COURT:  Yes. |
| 5 | MR. SCHIFFMAN:  I asked them yesterday, *Do you have* |
| 6 | *any information whatsoever that I know anything about the trade* |
| 7 | *secrets that are at issue in this case?*  I am telling you I |
| 8 | didn't.  You can look at the record, these are public |
| 9 | enforcement proceedings.  If they want to look at the record |
| 10 | over the weekend, they can.  They have them.  Their client |
| 11 | actually -- I no longer have the files. |
| 12 | THE COURT:  So, you are saying that the issue of |
| 13 | conflicts is transactional. |
| 14 | MR. SCHIFFMAN:  Yes.  The issue is -- |
| 15 | THE COURT:  And isn't related to this client now and |
| 16 | another client later?  It is not all -- that's fair game, you |
| 17 | can work for JP Morgan today and go to Deutsche Bank tomorrow? |
| 18 | MR. SCHIFFMAN:  Yes. |
| 19 | THE COURT:  Okay. |
| 20 | MR. SCHIFFMAN:  I mean, I think the issue on |
| 21 | litigation and, again, I discussed this last night with the |
| 22 | general counsel of Schulte, the issue on litigation is you |
| 23 | can't be adverse to a former client on a related matter.  I am |
| 24 | not being adverse to the client on a related matter. |
| 25 | THE COURT:  Okay. |

J385lekC

| 1 | MR. SCHIFFMAN:  And, in fact, I don't have the files.

When I was terminated by Mr. Lek in March of 2014, he

transferred all of the files to a new litigation counsel who

they're very friendly with and he has all the files including

all the transcripts, one of the matters is on appeal.  They

have all the records.

THE COURT:  I got it.  I got it.  You said that.

MR. SCHIFFMAN:  Thank you, your Honor.

If I may, your Honor, since we don't have a brief to

provide background to get there --

THE COURT:  Would you like to submit a brief?

MR. SCHIFFMAN:  I would like to submit brief at some

point, sure.

THE COURT:  When would you like to do that.

MR. SCHIFFMAN:  Wednesday of next week?

THE COURT:  Well, the longer you take to submit the

brief we have to figure out what happens in the interim.

MR. SCHIFFMAN:  Well, again, I don't want anything to

happen in the interim.

THE COURT:  Well, I know, but I don't know if that's

likely that nothing is going to happen.

MR. SCHIFFMAN:  Let's make the argument because I

believe that when I'm done --

THE COURT:  No, no, no, no.  Let's think about when

you are going to submit something in response to this.

J385lekC

1    Realistically.

2            MR. SCHIFFMAN:  I'm confused, your Honor.

3            THE COURT:  There was a lawyer from the Corp Counsel

4    recently in a case I had at trial and some issue came up, I

5    don't remember exactly what the issue was but she said to me,

6    *Judge, you haven't heard my closing yet.*  I said, *We haven't*

7    *even picked a jury yet.*

8            So, you're suggesting that you are going to convince

9    me today that I don't even have to set a schedule in this case.

10           MR. SCHIFFMAN:  Since I can't submit a brief today, I

11   think that I would like to be heard today on whether or not --

12           THE COURT:  Certainly I'm going to allow you to be

13   heard.

14           MR. SCHIFFMAN:  Again, let me address the points and

15   if you think there are things we should brief quickly then we

16   should do that.  We didn't get their brief until 2:30 a.m. last

17   night.

18           THE COURT:  This is not for my benefit, this is for

19   your benefit.  You're the defense counsel, you're the

20   defendants, and they have come with a whole stack of documents

21   and obviously I am going to give you the opportunity to respond

22   to them, including that e-mail or whatever it is that says *We*

23   *are the plaintiffs.*

24           MR. SCHIFFMAN:  Again, your Honor, let me see if I can

25   address some of these points in an order that I set up in

J385lekC

1    advance.

2              THE COURT:  Great.

3              MR. SCHIFFMAN:  Hopefully I hit all the issues you

4    want.

5              THE COURT:  All right.

6              MR. SCHIFFMAN:  First, they're seeking extraordinary

7    and drastic remedy.  There is no dispute about that.  They want

8    to change the status quo.  There is no doubt that when a person

9    seeks a TRO seeking to change the status quo they have to have

10   a higher status to meet.

11             THE COURT:  A higher standard, probably.

12             MR. SCHIFFMAN:  Higher standard.

13             THE COURT:  Right.

14             MR. SCHIFFMAN:  Thank you, your Honor.  We can cite

15   cases on that proposition.

16             THE COURT:  We all get that, we all know that.

17             MR. SCHIFFMAN:  Again, I think there is a substantial

18   question, your Honor, as to whether there is even federal

19   jurisdiction here.

20             THE COURT:  Okay.

21             MR. SCHIFFMAN:  They cite and they rely on the Federal

22   Defend Trade Secrets Act and the Copyright Act.  However, both

23   of those acts require allegations that they actually -- that

24   the defendant, Volant, actually is using or has acquired the

25   trade secret.  They do not allege that, nor can they allege

1   that, because Volant has not acquired nor is using it.  They

2   don't identify what that trade secret is and we haven't

3   acquired or used it and they don't allege it.  I will get there

4   in a second.

5            THE COURT:  I think it is unlikely, not because you're

6   not very persuasive but because it is a technical issue, but it

7   is unlikely that I'm going to decide today that I have no

8   jurisdiction.

9            MR. SCHIFFMAN:  I agree, your Honor.

10            THE COURT:  Otherwise I would have gone home, you

11   know, before this time.

12            MR. SCHIFFMAN:  Again, but this goes to likelihood of

13   success on the merits.

14            THE COURT:  Yes.

15            MR. SCHIFFMAN:  Again, copyright.

16            THE COURT:  If there is no jurisdiction you will have

17   a lot of success.

18            MR. SCHIFFMAN:  A lot of success.

19            THE COURT:  Right; before you get to the merits.  But,

20   like I say, that's an issue that would be very hard for me or

21   any other Judge, I think, to decide no jurisdiction just based

22   on the eloquence of defense counsel.

23            MR. SCHIFFMAN:  I want you to base it on the

24   complaint.  All I want you to do is look at the complaint and

25   what they allege and are those allegations sufficient to make a

J385lekC

1    cause of action.

2              THE COURT:  No, no, no.  I'm still stuck on

3    jurisdiction.

4              MR. SCHIFFMAN:  But, again, you decide -- again, your

5    Honor, I think --

6              THE COURT:  I'm not going to get to the cause of

7    action if there is no jurisdiction, right?

8              MR. SCHIFFMAN:  I'm saying there is no jurisdiction

9    because the way they have pled the federal causes of action are

10   insufficient and that's dependent upon the complaint.  If they

11   don't allege -- and they don't -- that Volant has acquired or

12   is using the trade secret, then they have no cause of action

13   under the Federal Defend Act.  If they don't --

14             THE COURT:  Excuse me.  Why do you think we are here

15   this afternoon?

16             MR. SCHIFFMAN:  Because they allege that B. Riley did.

17   And they say if Volant does the same thing as B. Riley, we

18   would have a problem.  The problem with their entire case, your

19   Honor, is they say you should assume that the conduct in

20   B. Riley is the conduct here.

21             Well, in fact, we behaved completely different.  We

22   have already shown you and will show you some more that we have

23   taken affirmative steps not to get that information, not to use

24   it, not to possess it.  We have received repeated

25   representations by Mr. Louis and by Mr. Fowler that they don't

J385lekC

1    have such information and they have specifically agreed not to

2    use such information.  We have put in specific procedures to

3    avoid the use of such information.

4              THE COURT:  I got it.  I got it.

5              MR. SCHIFFMAN:  Now and if you look at their

6    complaint -- I will get there -- there are only two times that

7    they mention us.  They never say we are using it, they never

8    say we copied it.  A violation of the Copyright Act requires

9    copying of the material.  They don't allege that Volant copied

10   the material.  All they allege, which is almost nonsensical, is

11   that Volant is the alter ego of Louis and Fowler.  That's not

12   sufficient to establish a violation of copyright.  And they

13   don't plead alter ego if they wanted to.

14             As to the copyright also, and this is a big problem

15   with their entire matter, they don't really -- what counsel

16   really says is what they really believe, is that Mr. Louis and

17   Mr. Fowler have a generic understanding of the clearing

18   industry and based on that generic understanding of clearing,

19   the whole business this they learned at Lek, they can't work

20   anywhere else.  But, that's not the law.  That's not a trade

21   secret.  The trade secret is a particular line of code, a

22   particular thing which they don't identify and which we don't

23   have.  And so, and they don't allege we have --

24             THE COURT:  If they don't identify it how do you know

25   you don't have it?

1          MR. SCHIFFMAN:  Because we have said to them, we have

2     represented you are not to use any material.  They said we

3     don't have any material from Lek.  None.  And you are not to

4     use any material from Lek.  And they have represented to us

5     that they're not going to do so.

6          Now, if they have evidence that they're violating that

7     agreement, then maybe we should be in litigation, but their

8     only evidence is their conduct at B. Riley.  They don't make

9     any allegations that Volant is violating the terms.  That's the

10    issue.

11         And they want you to rule against me and to issue

12    injunction against me because B. Riley may have done something

13    wrong and they may have a complaint against B. Riley.  Well

14    that's inappropriate.  You have to look at what they allege

15    against Volant.

16         THE COURT:  Yeah, I got that.  I got that.

17         MR. SCHIFFMAN:  Again, just an incredibly small nit.

18         On the copyright, even as to the copyright itself, the

19    complaint -- the complaint is the document here.  We only look

20    to the complaint for the facts that are alleged, not argued.

21    The complaint says that the copyrighted material, which has to

22    be registered, it is unclear to me but it looks like from the

23    complaint is that's material which was developed in 2007 that's

24    registered.  Again, they're so unclear as to what the trade

25    secret is you can't tell but there is surely no allegation that

J385lekC

1    the material which has been copyrighted and registered has in

2    fact been copied by Volant.  They don't allege that, nor can

3    they.  If they did so, they would be subject to sanctions for

4    doing so because they have no evidence of that.

5           Again, there is not a scintilla of evidence.  If you

6    look at the complaint, your Honor, you have only mentioned

7    Volant's activity in two places and we ask you to look at the

8    complaint.  Look at the complaint in paragraph 10.  This is

9    very telling.  What they say in complaint paragraph 10, if you

10   look at the second part, it says if Louis and Fowler are

11   permitted to work at Volant to replicate --

12          THE COURT:  Where are you?

13          MR. SCHIFFMAN:  I am in paragraph 10 of the complaint

14   in the middle of the paragraph.

15          THE COURT: Paragraph 10.  What page is that?

16          MR. SCHIFFMAN:  Page 5, 6, your Honor.  Page 6 of the

17   complaint, paragraph 10.

18          THE COURT:  Go ahead.

19          MR. SCHIFFMAN:  If you go halfway down, your Honor,

20   you see where it says if Louis and Fowler, it is the eighth

21   line down in that paragraph.

22          THE COURT:  If Louis and Fowler, yes.

23          MR. SCHIFFMAN:  Are permitted to work at Volant to

24   replicate the LSC and Rox system, or are permitted to disclose

25   this proprietary technology... Their case is they may do it,

J385lekC

| | |
|---|---|
| 1 | that it is an inevitability.  As your Honor knows, the |
| 2 | inevitability concept has been rejected. |
| 3 | THE COURT:  You think that's the only relevance so I |
| 4 | should dismiss the case based on that. |
| 5 | MR. SCHIFFMAN:  I would say they have not made |
| 6 | adequate allegations that we are doing it. |
| 7 | THE COURT:  Did you read paragraph 166? |
| 8 | MR. SCHIFFMAN:  166, let me look at that.  I read |
| 9 | paragraph 159 which is the only other paragraph about me.  Let |
| 10 | me see what 166 says. |
| 11 | THE COURT:  I asked you about 166. |
| 12 | MR. SCHIFFMAN:  166, your Honor, is a paragraph, an |
| 13 | account that says, upon information and belief, the defendants |
| 14 | possessed confidential information. |
| 15 | That's not a factual allegation, that's -- |
| 16 | THE COURT:  Excuse me; belonging to plaintiffs, |
| 17 | including source code. |
| 18 | MR. SCHIFFMAN:  Yes. |
| 19 | THE COURT:  The design of LSC's unique and proprietary |
| 20 | clearing system and strategic business information that |
| 21 | constitute trade secrets. |
| 22 | MR. SCHIFFMAN:  It is black letter law that that is a |
| 23 | conclusory allegation which is not supported by a factual |
| 24 | allegation. |
| 25 | THE COURT:  I thought you said they only made an |

J385lekC

1   allegation in paragraph 6.

2          MR. SCHIFFMAN:  Well, where they mentioned Volant and

3   specific activity.  I was looking at the factual places.  In

4   other words, that is clearly conclusory.

5          THE COURT:  What's wrong with this 166 as a paragraph?

6   It sounds pretty straightforward to me.

7          MR. SCHIFFMAN:  I can allege that X created a fraud

8   and damaged me but that's a conclusory allegation.  There is no

9   inference that, there is no evidence that that fact is true.

10  It is just a conclusion.  That is just stating the law that if

11  that was true there has to be a predicate to that.  There has

12  to be some basis --

13         THE COURT:  I am sure I don't understand what you are

14  saying.

15         MR. SCHIFFMAN:  If that was the sole sentence in the

16  complaint would that be valid?

17         THE COURT:  But it is not.  It is 166 on page 39 but,

18  for the life of me, you haven't been able to talk me out of

19  that paragraph.

20         MR. SCHIFFMAN:  I can try my best.

21         THE COURT:  No, no.  I mean, I'm not giving you a hard

22  time.  Seriously.

23         MR. SCHIFFMAN:  No, I understand.

24         THE COURT:  You are allowed to plead on information

25  and belief, right?

J385lekC

1          MR. SCHIFFMAN:  Not conclusory, not the ultimate

2     conclusion of the case.

3          THE COURT:  What do you mean the ultimate?  This says

4     that defendants possessed confidential information belonging to

5     plaintiffs.

6          MR. SCHIFFMAN:  On what basis?

7          THE COURT:  Including source code, the design of LSC's

8     unique and proprietary clearing system, and strategic business

9     information that constitute trade secrets.

10          Now, ultimately, in a trial or hearing or whatever we

11     are going to have here, they may not be able to prove that but

12     as an allegation in the complaint it sounds pretty

13     straightforward to me.

14          MR. SCHIFFMAN:  I think again, your Honor --

15          THE COURT:  This is without prejudice, of course, to

16     either side.  I don't know if they can prove it and I don't

17     know if it ultimately it can be proven but, if it were

18     ultimately proved or proven, it sounds pretty important.

19          MR. SCHIFFMAN:  Again, I believe, your Honor, I fear

20     to say that I think your Honor is wrong as to the impact of

21     that sentence.

22          THE COURT:  I have been wrong before about a lot of

23     things but I'm confident that that's an appropriate allegation

24     in a complaint here in the Southern District in a case such as

25     this.

J385lekC

| | |
|---|---|
| 1 | MR. SCHIFFMAN:  Appropriate or sufficient? |
| 2 | THE COURT:  I didn't say sufficient. |
| 3 | MR. SCHIFFMAN:  Well, that's what I point to you is |
| 4 | that it's not -- |
| 5 | THE COURT:  That's why we have trials.  Right?  That's |
| 6 | why we have discovery. |
| 7 | So, I'm not going to decide anything of sufficiency |
| 8 | today.  I am just going to decide whether you need some |
| 9 | temporary relief to get us until tomorrow or next week or |
| 10 | whatever. |
| 11 | MR. SCHIFFMAN:  I think that, again, it is not |
| 12 | sufficient to sustain the complaint.  It is the ultimate |
| 13 | conclusion in a complaint.  You can't just say you violated |
| 14 | Section 10b-5 by making material misrepresentations. |
| 15 | THE COURT:  This doesn't say that. |
| 16 | MR. SCHIFFMAN:  It does.  That's what it says. |
| 17 | THE COURT:  There is nothing about 10b-5 -- |
| 18 | MR. SCHIFFMAN:  I agree with you. |
| 19 | THE COURT:  -- nothing about material |
| 20 | misrepresentations.  Pretty straightforward. |
| 21 | MR. SCHIFFMAN:  Let me move on because I'm not going |
| 22 | to convince you.  If I have case law I will bring it to your |
| 23 | attention.  Let me move on. |
| 24 | Again, the only other paragraph that is specific to |
| 25 | Volant and not B. Riley is paragraph 159 on page 37. |

J385lekC

1          THE COURT:  Not to beat a dead horse but 166 makes no

2     mention of B. Riley.  It says defendants.  And I don't know if

3     that means the corporate clients or the individuals or both or

4     all of them but that's exactly what it says.  Again, I don't

5     know if it can be sustained ultimately, but that's what it

6     says.

7          MR. SCHIFFMAN:  Again, I heard you and I will not beat

8     that.

9          Looking at 159 which is the only other complaint about

10    Volant.  What it says on page 37, it says:  Then, in or around

11    June or July of 2018, Fowler admitted to Charles Lek that,

12    while on the trading desk, he demonstrated LSC and Rox'

13    dashboard to Volant.  Assuming that arguendo that allegation as

14    true, which it is not, that again raises no inference of any

15    wrongful conduct by Volant.

16         The complaint is bereft of any suggestion that Volant

17    has done anything wrong and we produced to you evidence that

18    they we have not.  That's what the affidavit does.  Let me move

19    on.

20         Again, there are lots of decisions out there that they

21    have to prove imminent harm.  You even ruled that in the

22    Browser Ltd.  V. Abraxis case in 2016.  What is their

23    allegation of imminent harm?  They have none.  There is no

24    allegation that we are using the material.  Their allegation is

25    that it is -- what is the word -- inevitable that we will use

J385lekC

1    it, there is no allegation that we are currently using it.

2    Consistent with your decision, what is the imminent harm that's

3    going to happen?  They say if we go to work for us they must

4    tell them at some point.  They're not saying we are telling

5    them know, they're not saying we are using it now, they're not

6    saying we are competing with them now.  In fact, we wouldn't be

7    able to compete with them even if we were using it for 18

8    months.  What's the imminent harm?  There is none.

9         Their argument, and I think your Honor sort of got

10   there, is that they say because they possessed confidential

11   information, they can never free themselves of that burden.

12   They can never work in their job.  That's not 18 months.  If

13   you ask counsel, well, 18 months from now could they work at

14   Lek using the information?  He would say no.  Their position is

15   once impregnated with this information they don't have to prove

16   that they're using it, they don't have to prove that they

17   passed it on.  They can be enjoined because it is inevitable

18   that they will use it.  Well, that's not the law.  The law is

19   to get an injunction he you have to prove that there is

20   imminent harm and there is actual damage.  They don't allege

21   it, nor can they.

22        It is not the law and in fact the reason that the law

23   has narrowed these restrictive covenants is to prevent this

24   exact type of disservice to say you can't work, you can't earn

25   an income because you worked for me and I trained you.  That's

1   not the law.  It is clearly not the law under, and as I said

2   and I think I showed you, let me repeat quickly, if you can

3   look at Exhibits B and C of Mr. Garfield's affidavit, contrary

4   to what they say about B. Riley, we took steps to make sure

5   that they did not give us the confidential information.  And if

6   you look on Exhibit B, which is a copy of Mr. Louis' document

7   and you look at the second page of that, it says in addition,

8   as described more actually in the employment agreement by

9   accepting this offer, you agree that you, A, have not taken any

10  documents, files, computer code, work products, etc.  Before we

11  even hired him we got a representation from him, as a term of

12  his employment, not to use the materials.  If you then look at

13  Mr. Fowler's letter, he makes a similar representation.  They

14  have no allegation that are untrue.  They say it is inevitable

15  that it is untrue, it must be untrue.  We suspect that counsel

16  who is making these representations, he doesn't know that.

17  That's not sufficient.

18          If you look at Exhibit D -- am I boring you?

19          THE COURT:  No.  I am thinking how important it

20  probably is for the two individual defendants to have

21  attorneys --

22          MR. SCHIFFMAN:  Right.

23          THE COURT:  -- because this kind of conversation is

24  going to go on and that it is what they said and it's you

25  saying what they said.

J385lekC

1          MR. SCHIFFMAN:  It is what they signed, your Honor.

2          THE COURT:  Well, I assume that they are going to get

3     attorneys.  Is that a fair assumption?

4          Are you going to get a lawyer?

5          DEFENDANT LOUIS:  Yes.  Very likely.  I just didn't

6     have time.

7          THE COURT:  I'm sorry?

8          DEFENDANT LOUIS:  Yes.  Very likely.  I need time to

9     start looking for an attorney.

10          THE COURT:  You don't have a lot of time.  I mean, you

11    see what's going on here.

12          DEFENDANT LOUIS:  Yes.

13          THE COURT:  My suggestion to you is that ought to be

14    your number one priority.

15          DEFENDANT LOUIS:  It is.

16          MR. SCHIFFMAN:  Your Honor, as to Volant, look at

17    Exhibit D, the employment agreement they represent and warrant

18    on D1:  I have not taken and do not have access or the ability

19    to retrieve any property belonging to my previous employer.

20          If you look at Exhibit E, the same representation,

21    they want you to change the status quo, though I have produced

22    to you documentary evidence we are not doing it and they say

23    you will inevitably do it.  That's not the balance of equities.

24    I don't know how one could issue an injunction taking them out

25    of the status quo where I have affirmative evidence that I am

J385lekC

1    complying with the law.  In fact, I can go further if you will

2    let me approach the bench, your Honor, we documented it

3    further.

4            If I may approach?

5            THE COURT:  You can, that's why I asked you before

6    when you would like to make a submission by.  It is very hard

7    to read these things on the fly, as it were, and make a

8    conclusion so I'm going to give you your full opportunity to

9    respond to their stack of papers.

10           MR. SCHIFFMAN:  But what I don't want to do is have an

11   injunction in the interim.  They're the ones who delayed.

12   They've known about this, they were put on notice.  Counsel's

13   representation to you is incredible.

14           If you look at the affidavits, your Honor, at Exhibit

15   B --

16           THE COURT:  You don't say you don't want to have

17   injunction.  What's the harm to you?

18           MR. SCHIFFMAN:  These guys aren't working, they're not

19   getting paid.

20           THE COURT:  You are representing them.

21           MR. SCHIFFMAN:  No.  If you are telling me what is the

22   injunction as to me, I can't hire them?

23           THE COURT:  They're already hired.

24           MR. SCHIFFMAN:  As long as they can go to work.  I

25   don't care if you enjoin from not using the proprietary

1    information I don't care.  We are happy to have that.  Happy to

2    have that, because they're not using the proprietary

3    information.  We are happy to have such a -- but what we don't

4    want is an injunction to us that we can't employ them.

5              THE COURT:  They're already employed.

6              MR. SCHIFFMAN:  They're already employed.

7              THE COURT:  So what's the harm?

8              MR. SCHIFFMAN:  Well, if you say we can't employ them

9    I am lost to know what is the harm.

10             THE COURT:  Well, I asked them that before.  I don't

11   know if the wording of their injunctive -- I don't know that

12   they're asking to have the Court fire them.

13             MR. SCHIFFMAN:  Yes.

14             THE COURT:  Or have you fire them.  I don't think so.

15             MR. SCHIFFMAN:  That's how I read their injunction.

16   They can't work there on Monday.

17             MR. SARKOZI:  Suspend.

18             THE COURT:  Yes.  Well, that's words.  I don't think

19   that's really what they have in mind.

20             MR. SCHIFFMAN:  I do, your Honor.

21             THE COURT:  Oh, well.

22             MR. SCHIFFMAN:  And I think it is clear, they don't

23   want them to work there.  They're saying they have confidential

24   information which they're inevitably going to disclose to us.

25             THE COURT:  I know, you said that before.  I get it, I

J385lekC

1    get the argument.

2           MR. SCHIFFMAN:  Look at Exhibit F, your Honor.  Again,

3    I don't know what he just said about registration.  Exhibit F,

4    we told them, in writing, on February --

5           THE COURT:  I don't know if they want to work there at

6    this particular time.  When I say that, I'm not acting as their

7    lawyer but they have to consult with counsel about what they

8    should do.

9           MR. SCHIFFMAN:  They want to work there.

10          THE COURT:  Okay.  I get that.  I get that.

11          MR. SCHIFFMAN:  If they didn't want to work there they

12   wouldn't have signed the agreement they signed.  If they didn't

13   want to do it they didn't have lawyers telling them to do it.

14          THE COURT:  Yes.

15          MR. SCHIFFMAN:  Again, if you look at Exhibit F and

16   Exhibit G, there is no -- this idea they didn't know until

17   yesterday is a conflation.  Their lawyers said we understand

18   that notwithstanding our letter of January 24, Volant intends

19   to hire Mr. Louis today, that's dated February 6.  Where have

20   they been?

21          This Court and many other Courts have said you don't

22   get TROs when you sit on your rights.  Why do we need an

23   injunction between now and Wednesday when they've sat on it for

24   over -- since January they knew we were going to hire them and

25   they have known since February 6.  Their own lawyer who is

J385lekC

1    sitting in this room today, wrote me a letter and say we know

2    you are hiring them today so I don't know why the Court would

3    get involved in issuing any orders when it doesn't know if it

4    has any jurisdiction.  We have come forward to show you that we

5    have procedures that we are not using stuff, they don't allege

6    we are using this stuff, and they have delayed.

7              THE COURT:  All right.  I got it.

8              I am going to hear them and then we are going to stop.

9              MR. SCHIFFMAN:  One more second to look at my notes?

10   One more second, your Honor.  (Pause)

11             If I can, just two more seconds on things we haven't

12   talked about.

13             The law under the Defend Trade Secrets Act.  I cite to

14   your Honor Free Country Ltd. v. Drennen.

15             THE COURT:  Go slower for the court reporter so she

16   gets all of these.

17             MR. SCHIFFMAN:  I should go slower for everybody,

18   right?

19             THE COURT:  Well, yes.  But, you know.

20             MR. SCHIFFMAN:  Thank you.

21             Again, your Honor, Free Country Ltd.  V. Drennen, 235

22   F.Supp. 3d 559 (S.D.N.Y. 2016).  And this is important.  In

23   denying an injunction in that case, the Court held that the two

24   corporate defendants did not know that the employees improperly

25   transferred any confidential information to the employees

J385lekC

<table>
<tr><td>1</td><td>personal possession and there was no evidence that the</td></tr>
<tr><td>2</td><td>corporate defendant ever got possession of the information.  In</td></tr>
<tr><td>3</td><td>this case not only is there no evidence that we got the</td></tr>
<tr><td>4</td><td>information, we have taken affirmative steps not to get the</td></tr>
<tr><td>5</td><td>information.  There is no violation of that section.  All</td></tr>
<tr><td>6</td><td>right?  They're saying we might get it.  That doesn't violate</td></tr>
<tr><td>7</td><td>the section.  That's why there should be no injunction.  In</td></tr>
<tr><td>8</td><td>fact, if you look at the DTSA, and this is incredibly</td></tr>
<tr><td>9</td><td>complicated so I will go slow.</td></tr>
<tr><td>10</td><td>          THE COURT:  Yes, I need for you to go slow if it is</td></tr>
<tr><td>11</td><td>incredibly complicated.</td></tr>
<tr><td>12</td><td>          MR. SCHIFFMAN:  1836(b)(3)(A)(i)(1), it talks about</td></tr>
<tr><td>13</td><td>when an injunction is appropriate under this section and it</td></tr>
<tr><td>14</td><td>specifically says that the injunction is only to be used to</td></tr>
<tr><td>15</td><td>prevent actual or threatened misappropriation.  You have to</td></tr>
<tr><td>16</td><td>have actual or threatened misappropriation.  And it says</td></tr>
<tr><td>17</td><td>specifically, "to prevent the person from entering into</td></tr>
<tr><td>18</td><td>employment relationship based merely on possessing the</td></tr>
<tr><td>19</td><td>information it insufficient.  Well, that is precisely what</td></tr>
<tr><td>20</td><td>they're doing here.  They're saying Louis and Fowler have the</td></tr>
<tr><td>21</td><td>information, they don't allege they've transferred it but they</td></tr>
<tr><td>22</td><td>say we don't want them employed.  The statute specifically says</td></tr>
<tr><td>23</td><td>you can't do that.  You can't do that.  It's in the statute</td></tr>
<tr><td>24</td><td>that they rely on.</td></tr>
<tr><td>25</td><td>          THE COURT:  By the way, what happened in that case six</td></tr>
</table>

J385lekC

seven months ago?

MR. SCHIFFMAN:  Which one?  B. Riley.

THE COURT:  I don't mean all of what happened.  So I mean what was the outcome.

MR. SCHIFFMAN:  The outcome was --

THE COURT:  They were going to go work for B. Riley, no?

MR. SCHIFFMAN:  They did not.

THE COURT:  They did not.

MR. SCHIFFMAN:  And the reason they did not is Mr. Lek took all their files.  They voluntarily, with lawyers, not me --

THE COURT:  They what?

MR. SCHIFFMAN:  Mr. Louis and Fowler had lawyers.

THE COURT:  Yes.

MR. SCHIFFMAN:  Those lawyers made all of their files available -- their e-mail, their thumb drive, their computers.

THE COURT:  Yes.

MR. SCHIFFMAN:  Gave them all back to Lek.  It was their lawyers' statement that there was nothing confidential or trade secret in the information.

THE COURT:  All right.

MR. SCHIFFMAN:  They gave it back to Lek nonetheless.  They don't have it anymore.

THE COURT:  Okay.

J385lekC

1        MR. SCHIFFMAN:  That was eight months ago.

2        THE COURT:  Did Lek drop the case?

3        MR. SCHIFFMAN:  They didn't go to work, there was no

4   case --

5        THE COURT:  That's really what I was aiming at.  How

6   come they didn't go to work there?

7        MR. SCHIFFMAN:  Why didn't they go to work where?

8        THE COURT:  B. Riley.

9        MR. SCHIFFMAN:  B. Riley, I believe, withdrew the

10   offer of employment because they knew they would be in court

11   with these guys because Mr. Lek seems to be more interested in

12   keeping Mr. Louis and Mr. Fowler from working than he is in

13   working out a deal so that they can go on to their life.

14        THE COURT:  Well, so now that brings us back to the

15   rub -- well, we are going to get to that in a minute.  We are

16   going to give him the last word and then we will see about this

17   deal.

18        MR. SCHIFFMAN:  Again, and the last thing is, your

19   Honor, and again I think the law is pretty clear on this on

20   delay, there is numerous cases in the Second Circuit including

21   your decision in Pune v. Rohrman, 10 years ago, in which you

22   recognize that delay in seeking a preliminary is devastating.

23        Well, how can they come to this Court a month after

24   their own lawyer said I know you are employing them, and seek

25   to disrupt the TRO.

J385lekC

| | |
|---|---|
| 1 | THE COURT:  What was the delay in this case of mine 10 |
| 2 | years ago?  Forgive me, I can't remember. |
| 3 | MR. SCHIFFMAN:  I beg your pardon, five months, it was |
| 4 | in a PI five months and it was in a copyright case. |
| 5 | THE COURT:  Got it. |
| 6 | MR. SCHIFFMAN:  Then, again, there is a Citibank bank |
| 7 | case in the Second Circuit where it was a 10-week delay for the |
| 8 | PI, not for the TRO.  The TRO seems to be much more |
| 9 | extraordinary. |
| 10 | Finally, your Honor, there is no doubt -- and, again, |
| 11 | this is an exhibit -- why they cannot succeed on the merits is |
| 12 | if you look at the declaration -- |
| 13 | THE COURT:  There is no doubt as to what? |
| 14 | MR. SCHIFFMAN:  Again, that -- |
| 15 | THE COURT:  There is no doubt in your mind that they |
| 16 | can't succeed on the merits. |
| 17 | MR. SCHIFFMAN:  Another factor why they can't succeed |
| 18 | on the merits -- |
| 19 | THE COURT:  Yes. |
| 20 | MR. SCHIFFMAN:  -- is if you look at Exhibit no. A, on |
| 21 | July 13th of 2018, nine months ago, Mr. Lek fired Mr. Fowler |
| 22 | and Mr. Louis, without cause.  It is, again, fairly easy law, I |
| 23 | can cite for you the Cisco Industries v. Advanced Plating |
| 24 | Technologies, 867 F.Supp 155 (S.D.N.Y. 1994), and Arakelian v. |
| 25 | Omnicom Care, 735 F.Supp Second 22 (S.D.N.Y 2010), that |

J385lekC

```
 1  non-compete and non-solicitation provisions are unenforceable
 2  where the employees are terminated, without cause.
 3           There is no basis for an injunction in this case.
 4  There is significant question of federal jurisdiction, you
 5  wouldn't change the status quo that they don't meet that
 6  burden.
 7           THE COURT:  I got it.
 8           MR. SCHIFFMAN:  They delayed in getting the TRO.
 9           THE COURT:  I got it.
10           MR. SCHIFFMAN:  Okay.  Thank you, your.
11           THE COURT:  This is just by way of rebuttal.
12           MR. SARKOZI:  On the issue of jurisdiction --
13           THE COURT:  Let's work backwards.  Let's go to the
14  issue that you don't want these two people to work ever again
15  anywhere.
16           MR. SARKOZI:  That is absolutely not the case.
17           THE COURT:  Right.
18           And you don't want me to, through this TRO, to fire
19  them either.
20           MR. SARKOZI:  They should be suspended as we sort
21  through all of this.
22           THE COURT:  So, what does that mean?
23           MR. SARKOZI:  What does that mean?
24           THE COURT:  Yes.  They get paid?  They stay home, they
25  watch CNN?  What does that mean they get suspended?
```

J385lekC

1          MR. SARKOZI:  They can get paid -- Brian, do you want

2     to address this?

3          THE COURT:  All I am suggesting, and you will have a

4     little more time do this, but D doesn't exactly work at this

5     stage, right, because they're already there, according to

6     Mr. Schiffman.

7          MR. COUSIN:  So, your Honor --

8          THE COURT:  And employed.  So.

9          MR. COUSIN:  They are employed, of course, but in

10    terms of suspension we all know you can be suspended with or

11    without pay.  It is not really for to us determine that.  I

12    don't think necessarily it is for anybody other than the

13    employer to decide whether they want to pay them or not.

14         THE COURT:  I don't know what it means to be

15    suspended.

16         MR. COUSIN:  It means not performing any services for

17    the company until there is a resolution one way or another.

18         THE COURT:  So they go home and they're watching CNN

19    or Netflix or something.  Can they call them on the phone?

20         MR. COUSIN:  Well, it depends what they're calling

21    them about.

22         THE COURT:  I know, but I'm asking what language for

23    D.

24         MR. COUSIN:  I understand.

25         THE COURT:  What would D have to look at that would

J385lekC

satisfy Mr. Schiffman and yourselves?  You will have to think
about it.

          MR. COUSIN:  I understand.  We have to think about it
but, in essence, consistent with our view of the case --

          THE COURT:  Yes.

          MR. COUSIN:  -- they should not be performing services
for Volant.

          THE COURT:  I get that.  I get that.

          Well --

          MR. COUSIN:  If services means picking up the phone --

          THE COURT:  It depends what "services" means.

          MR. COUSIN:  I am trying to get more granular.

          THE COURT:  You said before there are other kinds of
work they can do.

          MR. COUSIN:  Not at Volant, your Honor.

          THE COURT:  At all.

          MR. COUSIN:  Not at Volant.  Because you asked
Mr. Sarkozi the question can they do another job at Volant? and
I believe he answered it no.  And the reason for that is
because this is what they do and because this is what Volant
does.  And the problem is that any question asked about their
experience, their knowledge, what they would do --

          THE COURT:  I got it; endangers you.  I got it.

          MR. COUSIN:  Absolutely, your Honor.

          THE COURT:  Let's talk a little bit about this

J385lekC

1    discovery that you are seeking.  So you are seeking documents,

2    first of all?

3            MR. COUSIN:  Certainly, your Honor.

4            We have document requests, we have interrogatories, we

5    have notices of deposition, we have deposition of the

6    individual defendants, we have 30(b)6 depositions of the

7    entities.

8            THE COURT:  So, we are going to take a pause here now.

9            MR. SCHIFFMAN:  Your Honor, may I be heard on

10   discovery?

11           THE COURT:  No.  You will ultimately, but here is what

12   I'm going to propose.  I'm going to propose that defense

13   counsel and plaintiffs counsel take a look at that TRO and see

14   what in it they could live with, so to speak.  So, what it

15   means, the hard one is the employees.  Can they work?  Do you

16   have to fire them?  What language would satisfy both of you

17   there.

18           A, B, and C is schedule.  So, there is going to be

19   expedited discovery here and the question is what is that going

20   to include and what are time tables that you are both

21   comfortable with.

22           MR. SCHIFFMAN:  Again, your Honor, I really suggest

23   that we need to hit the pause button here.

24           THE COURT:  Thanks very much but sometimes the Judge

25   doesn't signal what he is intending to do.  I am giving you a

J385lekC

```
 1   signal to help you to come up with something that is workable
 2   between the two of you.
 3              MR. SCHIFFMAN:  But can we get --
 4              THE COURT:  Don't -- I'm not saying you lose the case.
 5   Right?  I'm not deciding the merits but I am saying what is
 6   likely to happen.
 7              MR. SCHIFFMAN:  I understand but, again, I think you
 8   said to me, and I hope --
 9              THE COURT:  You said to me you would like to submit a
10   written response by Wednesday.
11              MR. SCHIFFMAN:  I want to find out --
12              THE COURT:  There is a date --
13              MR. SCHIFFMAN:  But I want to find out if you have
14   jurisdiction.  I don't think we should have a discovery
15   schedule when within the seven days --
16              THE COURT:  I would like to find that out as well.
17              MR. SCHIFFMAN:  Since you are going to find out within
18   several days -- we are not talking a long delay -- why do we
19   put in a discovery schedule on Friday when Wednesday you can
20   have a brief on jurisdiction and decide it?
21              THE COURT:  Because I move quickly and I'm going to
22   move quickly today.
23              MR. SCHIFFMAN:  Okay.
24              THE COURT:  So, I'm not going do nothing.
25              MR. SCHIFFMAN:  Okay.
```

J385lekC

| | |
|---|---|
| 1 | THE COURT:  So, having said that, I should try and do |
| 2 | something that both of you find reasonably agreeable. |
| 3 | MR. COUSIN:  Your Honor? |
| 4 | THE COURT:  That's what I'm going to suggest you do |
| 5 | now. |
| 6 | MR. COUSIN:  Thank you, your Honor. |
| 7 | So, what we had scripted out in our discovery is that |
| 8 | we thought that within a reasonable period of time whenever |
| 9 | they can get the documents, if there was a TRO -- |
| 10 | THE COURT:  I'm not talking now reasonable.  You are |
| 11 | not hearing me either.  I am saying you are going to look at |
| 12 | the documents by Tuesday or you can have the depositions of the |
| 13 | two individuals -- |
| 14 | MR. COUSIN:  Yes. |
| 15 | THE COURT:  Wait a minute.  I haven't even said what |
| 16 | I'm going to say and you are already saying yes. |
| 17 | Are you going to take the depositions of the two |
| 18 | individual defendants?  Or not? |
| 19 | MR. COUSIN:  Your Honor, what we intended to do was |
| 20 | get the documents first as soon as we can -- |
| 21 | THE COURT:  Yes. |
| 22 | MR. COUSIN:  -- and then, within five business days |
| 23 | but we can go shorter -- |
| 24 | THE COURT:  You are going to go much shorter but I'm |
| 25 | asking you now, you must have a sense who you want to depose. |

J385lekC

1          MR. COUSIN:  We want to depose the two individual

2     defendants.

3          THE COURT:  You can't do that unless they have a

4     lawyer, right?

5          MR. COUSIN:  Well that's not true, your Honor.

6          THE COURT:  I know, but in the real world, right?

7          MR. COUSIN:  In the real world we would have no

8     interest in speeding along without them having counsel.  If we

9     know that they're going to have counsel next week we would, of

10    course, wait until they have counsel.

11         THE COURT:  Right.

12         MR. COUSIN:  But what we are saying is whatever

13    schedule your Honor wants to move under, I was just thinking

14    from an orderly, efficient perspective we should get documents

15    first and then depositions.

16         That's the only thing I was trying to convey.

17         THE COURT:  What I am trying to convey is he said

18    there shouldn't be any restraint at all, right?  And I'm saying

19    that there is restraint, it should be as painless to him as

20    possible.  You are saying that, oh, well if I have a TRO I

21    don't really care, we could string this thing out for six

22    months.

23         MR. COUSIN:  No.

24         THE COURT:  Don't say yes or don't say no.

25         MR. COUSIN:  Okay.

J385lekC

1          THE COURT:  What I am saying to you, the two of you is

2     when we go off the record, which is going to happen within 10

3     seconds or so, you two are going to come up with a plan as to

4     how we move forward and that plan has got to satisfy A, B, C,

5     and D, to both sides.

6          So, you let me know.  I am happy to let you stay here

7     and talk here.  If you want to go in the jury room, you can

8     talk in the jury room.  All right?  And then you let me know

9     when I should come back.

10          MR. COUSIN:  Thank you, your Honor.

11          MR. SARKOZI:  Thank you, your Honor.

12          MR. SCHIFFMAN:  Thank you, your Honor.

13          THE COURT:  Incidentally, what you can't do, either

14     side, is make legal determinations or even scheduling

15     determinations for the individual defendants who are -- one of

16     whom who is not even here and the other of whom has no

17     attorney.  So, you have to factor that in.  Okay?

18          Thanks.

19          MR. COUSIN:  Thank you, your Honor.

20          MR. SCHIFFMAN:  Thank you, your Honor.

21          MR. SARKOZI:  Thank you.

22          (recess)

23          THE COURT:  So, have you all met and conferred?

24          MR. COUSIN:  Your Honor, we met and conferred with

25     regard to just the first page of the order to show cause

J385lekC

 1   dealing with the A, B, C, D.  We got stuck on D and then

 2   opposing counsel went back and decided to speak amongst

 3   themselves for a while and that's where we left off.  We were

 4   also asking them to come back with a proposed discovery

 5   schedule and we haven't heard back from them yet but we

 6   expected them to propose that.

 7            MR. SCHIFFMAN:  Your Honor, maybe you can help us.

 8            What have agreed to, again, what we are willing to do,

 9   your Honor, what we said to them is as to Volant, obviously the

10   individuals aren't involved.

11            THE COURT:  Wait a minute.

12            With respect to those individuals, right, they are

13   going to get counsel, right?

14            MR. SCHIFFMAN:  Yes, sir.

15            As to A, Volant is willing to agree to some period of

16   time subject to your Honor's decision.

17            THE COURT:  Okay.

18            MR. SCHIFFMAN:  That we will be enjoined from using or

19   accessing plaintiff's trade secrets.  We are okay with that.

20            As to B, requiring defendants, i.e. Volant, Volant

21   will immediately return all plaintiffs' computer code,

22   documents, and data.  We are willing to represent we have none.

23            THE COURT:  So that's no problem either, right?

24            MR. SCHIFFMAN:  As to C, requiring during the pendency

25   C -- C, that we preserve all plaintiff's code.  Again, we are

J385lekC

1    willing to put on the record we have none.

2              THE COURT:  That's no problem either.

3              MR. SCHIFFMAN:  A, B, and C are no problem.

4              THE COURT:  D.  What can we do there?

5              MR. SCHIFFMAN:  What we propose on D is that we would

6    continue to employ and pay the individuals but we would limit

7    the scope of their employment to things which they said were

8    objectionable.  We suggested that we limit it to that they will

9    agree, during the pendency, whatever the pendency will be, not

10   to code or prepare any specifications for the clearing system.

11   And we asked them if they had any other tasks which they didn't

12   want them do and would consider it.

13             MR. COUSIN:  Your Honor, we had a problem with that

14   because it's kind of like trying to figure out what you don't

15   know exists.

16             So, we understand that they have a business plan that

17   they've put forth during months 1 through 3 of that business

18   plan.  They're supposed to be doing things like technology

19   backbone completion, hardware installation, networking servers,

20   working on message router, and database op.  So, none of those

21   things, for example, which we would consider sort of setting

22   the stage for the next part of the business plan would come

23   under the areas that counsel has agreed that they would be

24   restrained from doing.  So, this is our big concern, because

25   what he is saying is, oh, they're not going to do any coding.

J385lekC

1   Well, the infrastructure set up --

2           THE COURT:  What is your counter-proposal to this?

3           MR. COUSIN:  Our counter-proposal was that they

4   shouldn't do any work for the company during the very brief

5   restrictive period.

6           THE COURT:  How brief?  Wednesday?

7           MR. COUSIN:  Your Honor, that is fine with us.  Our

8   concern is we wanted to know how fast the production could

9   happen and that's what we were waiting to hear back from.

10          We do believe there should be a TRO in place until the

11  preliminary injunction is heard and resolved whenever that is

12  and we are prepared do it as soon as possible.

13          THE COURT:  You are going do a little more work on

14  D -- you, plaintiffs -- with him.

15          MR. COUSIN:  Your Honor, he is supposed to come back

16  to us.

17          THE COURT:  He is here.

18          MR. COUSIN:  I understand.

19          THE COURT:  So, we are going to go off the record

20  again and talk to him about D because A, B, and C are no

21  problem.

22          MR. COUSIN:  Okay.

23          THE COURT:  All right?

24          MR. COUSIN:  Thank you, your Honor.

25          THE COURT:  So, even with regard to D, I think that

J385lekC

1    there needs to be an intermediary step like sometime next week

2    or so that the two individual defendants have the opportunity

3    to have counsel and those counsel, whoever that turns out to

4    be, can come back to the Court and explain why it should or

5    shouldn't, the restriction on them should or shouldn't

6    continue.  So, that's, whatever that restriction is, it's not a

7    long-term restriction.

8         Do you know what I'm saying?

9         MR. SARKOZI:  I do.

10        THE COURT:  So, with that in mind, I think you should

11   be able to come up with something for D.

12        (recess)

13        THE COURT:  What have you got?

14        MR. COUSIN:  Your Honor, we conferred and we thought

15   that the thing that would make the most sense is to have a

16   complete bar on working until just Wednesday, and then by that

17   point the individuals would have counsel, we would appear

18   before your Honor again and then reassess and we could have an

19   extension of the TRO, if appropriate at that point.  Or not.

20        That would be our first proposal.  The other side

21   didn't agree to that.

22        THE COURT:  Why is that?  Seems like a pretty

23   short-term --

24        MR. SCHIFFMAN:  Again, why should they not be allowed

25   to go to work for three days?  They've been going to work for

J385lekC

1    the 30 days.

2            THE COURT:  What's the big deal if you are going to

3    pay them?

4            MR. SCHIFFMAN:  Again, now you are enjoining them for

5    three days for tasks that you agree they're allowed to do.

6            THE COURT:  No.  Do you know what I'm doing, honestly?

7            So, I'm enjoining them from, yes, interacting with

8    another defendant for three days in a case where serious

9    allegations are made against those corporate defendants and

10   those two individuals, and them not having counsel to explain

11   why that is okay or not okay.

12           MR. SCHIFFMAN:  But whose fault is that and who should

13   bear the --

14           THE COURT:  It is not a question of fault --

15           MR. SCHIFFMAN:  It is.

16           THE COURT:  Excuse me.  It is in their own best

17   interest.  In my opinion.

18           MR. SCHIFFMAN:  They were notified at 10:00 a.m.

19   yesterday to do this.  These people have been sitting on this

20   for 30 days.

21           THE COURT:  Listen.

22           MR. SCHIFFMAN:  Why don't we just come back on

23   Wednesday and decide on Wednesday and let them work for the

24   next two days.  It is punitive.

25           THE COURT:  It is not punitive.  If everybody has good

1   faith as you -- you, Mr. Schiffman -- have represented, it

2   shouldn't be any burden at all.  The only time it is punitive

3   is if there is something going on that the plaintiffs are

4   alleging that you are concerned about.

5           MR. SCHIFFMAN:  No, no.

6           You are telling people they can't go to work, they

7   have to sit home and watch Netflix for three days.  That's

8   punitive and the plaintiffs are doing it, and this is

9   consistent with what I believe Mr. Lek is all about.  He wants

10  to punish them.  Whatever information they gave them, they gave

11  them from February 5 until today.  You are telling me that it

12  makes a difference whether they work on Monday, Tuesday, and

13  Wednesday, having worked for the last 30 days?

14          THE COURT:  I am telling them it makes a difference

15  that they can get lawyers and they can have this discussion

16  with their own lawyers and not with you, necessarily.

17          MR. SCHIFFMAN:  I agree with that.

18          THE COURT:  And I say that respectfully.  And you

19  agree with that also.  That's really what I am saying.

20          MR. SCHIFFMAN:  But why are you punishing them for the

21  three days?

22          THE COURT:  I am protecting them until they come back

23  here with their counsel.  That's what I'm doing.

24          MR. SCHIFFMAN:  Okay.  Again, we came up with a

25  reasonable -- here is what they won't do.  What they have in

J385lekC

1    front of them is they have the B. Riley document.  What they

2    read to you is the B. Riley business plan.  I said to you, go

3    through the B. Riley business plan.  Anything in there that you

4    think is objectionable, tell them they won't do it and we will

5    agree to it.

6            Why can't we restrain them from doing that which is

7    improper?  Why are we restraining them overly broadly?

8            THE COURT:  So, what would you say?

9            MR. SCHIFFMAN:  I told what you I would do.  I said to

10   them tell me what you don't want them --

11           THE COURT:  No, I'm asking you.

12           MR. SCHIFFMAN:  I told you.  I have a suggestion:  I

13   said they won't do any coding and they won't work on any

14   specifications.  Whatever technical work they have, tell me

15   what it is, we won't do it.  We are happy to do that.

16           THE COURT:  Without prejudice to your argument, I'm

17   going to restrain them until next Thursday at 2:00.

18           What about these other dates for discovery, etc.  Did

19   you work those out?

20           MR. SCHIFFMAN:  No, your Honor.  Again, this is going

21   to be -- we do not have the ability today -- I know you are

22   going to yell at me.

23           THE COURT:  Did anybody hear me yell?  I don't think

24   so.

25           MR. SCHIFFMAN:  Again, we have 30 document requests.

J385lekC

1    Those document requests ask us for all our proprietary

2    information on what we are doing to build our confidential

3    system.  We are not going to agree on that.  You are going to

4    have to rule on this.  They want to have discovery before they

5    have a case of all of our stuff and then they're going to write

6    their case having read my documents.

7              That's not appropriate.

8              THE COURT:  So, that's timing and dispute.

9              MR. SCHIFFMAN:  That's going to make it very difficult

10   to do that.

11             THE COURT:  Oh well.

12             MR. SCHIFFMAN:  There are some limited documents I

13   give them on hiring but we are not answering 25 pages of

14   interrogatories in the next week.  They want it now, they don't

15   have a case, they want you to grant them expedited discovery as

16   a fishing expedition and then they'll come back with a case and

17   that's not appropriate.  I don't think we work that out on

18   Friday afternoon.

19             THE COURT:  You don't mean that.  You don't mean that

20   they're going to find a case.

21             MR. SCHIFFMAN:  No.

22             THE COURT:  You think they'll never find a case,

23   right?

24             MR. SCHIFFMAN:  I believe they'll come back and we

25   will, whatever we give them, they'll say it's inappropriate no

J385lekC

```
 1   matter what.  Doesn't matter.  And I don't think they're
 2   entitled to discovery until we decide if there is a case or
 3   not.  Limited discovery, but I think we went through discovery
 4   and unless we give them some limited discovery.
 5              THE COURT:  So, this is a TRO that talks about
 6   personal service.  Who does that apply to?  I guess the -- can
 7   you accept service on behalf of the corporate defendants?  I
 8   guess you can.
 9              MR. SCHIFFMAN:  Sure.  Of course.
10              THE COURT:  But it is really the individual defendants
11   that this applies to or does it not apply to anybody?  Personal
12   service of copy of this order and supporting materials
13   submitted to the Court by overnight mail, etc.
14              Well, you will have do all the defendants, that's all.
15   So, counsel, you don't want to commit to a date for opposition
16   and reply at this time because you don't know when that --
17              MR. SCHIFFMAN:  No, I'm glad to do that.
18              THE COURT:  Are you?
19              MR. SCHIFFMAN:  Yes, sir.
20              THE COURT:  When do you want it do opposition?
21              MR. SCHIFFMAN:  Opposition -- I'm lost, your Honor.
22   Where are we?
23              THE COURT:  If you look on page 3 of their TRO, they
24   talk about opposition papers.  I don't know if this refers to
25   the opposition to what they've given you so far or the
```

```
 1    opposition that after the discovery process.  I'm not sure
 2    which that refers to.
 3            MR. SCHIFFMAN:  I'm not sure either.  I'm happy, if
 4    your Honor would like, by close of business on Tuesday, to file
 5    a brief as to the issues that we have been discussing today.
 6            THE COURT:  Okay.  So let's, wherever that fits, all
 7    right.  So, if you want to put that -- I will put that in here.
 8            MR. SCHIFFMAN:  What I would say is our schedule is we
 9    will get you a brief by close of business on Tuesday.  You can
10    then, between Wednesday and when the injunction runs out on
11    Thursday, decide what you want to do next.
12            THE COURT:  Are you talking about 4:00 p.m. on 3/12 is
13    when you are going to submit this opposition?
14            MR. SCHIFFMAN:  I was actually hoping, your Honor,
15    that I could have until midnight.
16            THE COURT:  You can have until 3/13.  Why don't you
17    take 3/13.
18            MR. SCHIFFMAN:  Max, who is writing the paper, says
19    sure, he will take that; so by 4:00 on 3/13.
20            THE COURT:  Yes.  I don't think we need reply papers.
21            MR. COUSIN:  Your Honor?
22            THE COURT:  Yes.
23            MR. COUSIN:  Just on that point, I would tend to agree
24    with you but sometimes what happens --
25            THE COURT:  This doesn't even mean, I don't think this
```

J385lekC

opposition, I think this means in concept that the bigger

opposition to post-discovery before there is going to be a

hearing, etc., etc., so.

        MR. COUSIN:  Your Honor, if I may?

        THE COURT:  Yes.

        MR. COUSIN:  The only thing I was going to say is that

sometimes what happens is you get opposition papers in a

situation like this and there may be a need for just a

particular fact or particular case to be distinguished or

some --

        THE COURT:  Bring that to my attention.

        MR. COUSIN:  I just wanted to reserve it.  Thank you.

        THE COURT:  I know.

        MR. SCHIFFMAN:  Your Honor, I have another suggestion.

        THE COURT:  Yes.

        MR. SCHIFFMAN:  I would suggest that by 4:00 on next

Wednesday that we file our objections and/or responses to all

the discovery requests so that you can rule on that as well.

        THE COURT:  Oh.  I can rule on it when?

        MR. SCHIFFMAN:  Whenever you want.

        THE COURT:  Between Wednesday night at midnight and

Thursday at 2:00?

        MR. SCHIFFMAN:  Or whenever.  Or the next week.

        THE COURT:  No.  That's going to the magistrate judge.

        MR. SCHIFFMAN:  Okay.  I mean I just --

J385lekC

1           THE COURT:  I doubt that the magistrate judge is going

2      to be able to accommodate that time frame.  But you want to

3      file --

4           MR. SCHIFFMAN:  I just want to file my objections.

5      What you do with them is up to you.

6           THE COURT:  What, exactly, do you wish to file and

7      when do you wish to file them?

8           MR. SCHIFFMAN:  I would like to go through their

9      document requests and their interrogatories and file

10     appropriate -- what I am willing to produce and what I am not

11     willing to produce and I want to do that on an expedited

12     schedule.

13          THE COURT:  You tell me.

14          MR. SCHIFFMAN:  I will do it by 4:00 on Wednesday the

15     13th, just like the brief.

16          MR. SARKOZI:  Your Honor?

17          THE COURT:  Yes.

18          MR. SARKOZI:  Just on the issue of service.  All of

19     the papers that plaintiffs have that we provided to the Court

20     and which were filed today in the court were provided by e-mail

21     to counsel for Volant as well as to Mr. Louis and Mr. Fowler.

22     So, just in terms of service and the manner of service that you

23     might require, perhaps those papers that have been served

24     already shall be deemed served, or if you just would like the

25     FedEx overnight as well, we are happy to do that.

J385lekC

1          THE COURT:  I'm not sure I understand it.  What did
2   you mean?  You wrote the document that I'm looking at, right?
3          MR. SARKOZI:  Right.  No, this is.
4          MR. SCHIFFMAN:  Paul, we are willing to accept
5   service.
6          MR. SARKOZI:  You are going to accept service.
7          THE COURT:  So it is NA, right?
8          MR. SARKOZI:  Right.
9          THE COURT:  Because it has already been made.
10          MR. SARKOZI:  Except for the two individuals.
11          THE COURT:  Yes.
12          MR. SARKOZI:  I don't know.  May I ask Mr. Louis if --
13          THE COURT:  I don't think so.
14          MR. SARKOZI:  We will serve them by overnight mail
15   then.
16          THE COURT:  Yes.  Okay.
17          MR. SARKOZI:  That's fine.  Thank you, your Honor.
18   (Pause)  Your Honor, I apologize.  In that overnight mail, if
19   we can change that to overnight courier?
20          THE COURT:  I am putting it in right now.
21          MR. SARKOZI:  This is the service paragraph, third
22   under the bottom of on page 3.
23          THE COURT:  Page 3.
24          MR. SARKOZI:  Third from the bottom where it says in
25   the second line "by overnight mail."  I apologize.  If we can

J385lekC

1    say "overnight courier" it might be better for FedEx to send it

2    on Friday.

3              THE COURT:  All right.  So, here is what we have:

4              On page 1, I am replacing in three lines up from the

5    bottom, I am replacing the word "enjoining" with the word

6    "suspending."

7              On page 2 I am inserting the "14th" in two places --

8              MR. SCHIFFMAN:  Your Honor, on page 1 do you want to

9    leave pendency of the action?

10             THE COURT:  Yes.  It doesn't matter because the

11   pendency of the action or until we decide otherwise.

12             MR. SCHIFFMAN:  But I thought --

13             THE COURT:  You haven't heard everything I have

14   said --

15             MR. SCHIFFMAN:  Okay.  I'm sorry.

16             THE COURT:  -- so you don't really know.

17             MR. SCHIFFMAN:  Okay.

18             THE COURT:  Right?

19             So, yes is the answer.  That's the only change.

20             Then on page 3, I am requiring that the claimants post

21   security in the amount of $10,000 and that be done on or before

22   4:00 p.m. on Monday.  You can work that out, the form of that

23   security with the Clerk of Court.

24             The paragraph after that, I am inserting after the

25   word "overnight courier or," and then inserting before the word

J385lekC

1   "defendants," "individual" and the time for that is 4:00 p.m.

2   on 3/11/19.

3          The section that talks about opposition papers I am

4   inserting on or before 4:00 p.m. on 3/13/19 and I am adding

5   also "and any response to plaintiff's document requests."

6          The next paragraph is NA.  It will be dated today's

7   date but there is this that is added at the bottom, an

8   additional order and it reads, as follows:

9          *Messers Louis and Fowler are advised that the Court*

10  *believes it is in their best interest to retain counsel as soon*

11  *as possible and return to Court on Thursday, 3/14/19 at 2:00*

12  *p.m. to further discuss the terms of this temporary restraining*

13  *order.*

14         And then, the last sentence I am adding is that "all

15  parties to meet and confer prior to 3/14, 2019 rat 2:00 p.m.

16  regarding global settlement of this case."

17         So, I'm going to post that on the docket.

18         MR. SCHIFFMAN:  Your Honor, may I be heard?  That's

19  not acceptable to us and we should explain why.

20         THE COURT:  It may be unacceptable but that's what it

21  is going to be contained in this order.

22         MR. SCHIFFMAN:  Your Honor, what you asked us to agree

23  to and what we did, if you look at page 2 you have to strike

24  the paragraph that says "ordered or required to return."  We

25  are not going to return, we are going to represent that we

J385lekC

1 | don't have any --

2 | THE COURT:  It is same thing, counsel.

3 | MR. SCHIFFMAN:  No, but let's get it right.

4 | THE COURT:  You know what?  They're just words.

5 | MR. SCHIFFMAN:  Let's get it right.  Let's get the

6 | words right.

7 | THE COURT:  You are just talking about words.

8 | MR. SCHIFFMAN:  Let's get the words right.  And it

9 | should be B, that it should not be and it is not an appropriate

10 | injunction to have it during the pendency.  You just ruled that

11 | they were enjoined --

12 | THE COURT:  Counsel, I get it.  You heard what I said

13 | and what I said is of no harm to you so just talking, you know,

14 | I don't want to be rude but it is just words right now.

15 | MR. SCHIFFMAN:  Your Honor, your Honor, may I ask one

16 | thing?

17 | You ruled that the suspension was going to be until

18 | Thursday at 2:00.

19 | THE COURT:  Yes.

20 | MR. SCHIFFMAN:  Can't we just write that in the order?

21 | Why are you saying during the pendency of the action?  It takes

22 | 30 seconds to make it precise.

23 | THE COURT:  Because what if they don't come back --

24 | MR. SCHIFFMAN:  That's your ruling.

25 | THE COURT:  Listen.  I don't want to play gotcha with

J385lekC

1    you.  You are fully protected, they're fully protected.  When

2    you come back on Thursday, you are not shy I have learned

3    today, so if you have some complaint you will come and make it.

4            MR. SCHIFFMAN:  You made a ruling.  Why can't we put

5    in the order what the ruling is?  I don't understand.

6            THE COURT:  I think the ruling reflects what I said.

7            We are going to post that.  We are going to give you,

8    each side a copy of this TRO so you will have it even before it

9    goes up on the docket.

10                                o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25